UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

JASON MOOREHEAD
*Plaintiff*

vs.

SCHOOL DISTRICT OF THE CITY OF ALLENTOWN;
BOARD OF SCHOOL DIRECTORS OF THE SCHOOL
DISTRICT OF THE CITY OF ALLENTOWN;
THOMAS PARKER;
NANCY WILT;
NICHOLAS MILLER;
SARA J. BRACE;
LISA A. CONOVER;
PHOEBE D. HARRIS;
CHERYL L. JOHNSON-WATTS;
AUDREY MATHISON;
CHARLES F. THIEL;
LINDA VEGA;
ANTHONY PIDGEON;
MARILYN MARTINEZ;
JENNIFER RAMOS
JOHN D. STANFORD;
PATRICK PALMER;
LATARSHA BROWN;
JENNIFER LYNN ORTIZ
*Defendants*

CIVIL ACTION NO.:
5:22-CV-03959-JMG

CAUSES OF ACTION:

I.   1ST AMEND. FREE SPEECH & ASSEMBLY RETALIATION

II.  1ST AMEND. POLITICAL AFFILIATION RETALIATION

III. DECLARATION 24 PA. CS §11-1122 UNCONSTITUTIONAL

IV.  14TH AMEND. DUE PROCESS VIOLATIONS

V.   4TH, 5TH, & 14TH AMEND. VIOLATIONS

VI.  NAME CLEARING HEARING

*JURY TRIAL DEMANDED*

# AMENDED COMPLAINT[1]

[1] On April 17, 2023, the court issued an opinion striking certain defendants, averments, and claims. See Doc. No. 27. In filing this Amended Complaint, only to preserve his rights and protect against waiver, Plaintiff has included the stricken defendants, averments, and claims. See generally Tsoi, Mike Chak Hin (2012) "Raise It (again?) or Waive It—Preserving Claims for Appellate Review When They Are Dismissed with Leave to Amend," WILLIAM MITCHELL LAW REVIEW: Vol. 38: Iss. 4, *available at* http://open.mitchellhamline.edu/wmlr/vol38/iss4/7 (describing inconsistent approaches to preserving dismissed claims in amended complaints among the circuits). Plaintiff, however, understands that they have been stricken and is not attempting to circumvent or re-adjudicate those dismissed claims, averments, and defendants, nor would Defendants' Answer(s) have to address them. The only things at issue regarding this amended complaint are Count V and the related allegations regarding FBI involvement which the Court gave Plaintiff leave to amend to address.

## Introduction

1.      Plaintiff Jason Moorehead was an employee for 18 years of defendant Allentown School District as a social studies teacher at Raub Middle School. He has a spotless record. He moved from Seattle to Allentown specifically to work with and help kids in a disadvantaged minority community. Many teachers are unable to cope with the pressure and challenges of this environment, but Mr. Moorehead thrived. He also led numerous extra-curricular activities, and had literally given his students the clothes off his own back if needed.

2.      Mr. Moorehead is also a conservative republican who supported Donald Trump for President. This was not a fact he widely shared due to the extreme hostility in the public school system toward even mildly right-of-center viewpoints, including the administration and Board of the Allentown School District. Many members of the Allentown school board are left-wing ideologues who have a visceral hatred for right-of-center opinions and political affiliations. They are all fairly characterized as left wing and Democrats.

3.      After the 2020 election Plaintiff went to the January 6, 2021 rally at the Washington Monument to hear President Trump speak.

4.      Plaintiff listened to the speeches, got a hot dog, and then boarded a bus back to Allentown, PA. He was at all times more than 1 mile away from the Capitol Building and the infamous riot that took place there.

5.      Yet, on the morning of January 7, 2021, he learned to his surprise that Defendants had suspended him indefinitely for participating in the riot at the Capitol Building—even though he was not there. He was shocked when defendant superintendent Thomas Parker blasted out an egregiously false press release on social media later on January 7, 2021, stating:

> On January 7, 2021, the Allentown School District (ASD) was made aware

of a staff member who was involved in the electoral college protest that
took place at the United States Capitol Building on January 6, 2021.

Exhibit 1. Although the press release did not name him, Mr. Moorehead was readily identifiable

as the referenced teacher and was in fact so identified by the public. The suspension and press

release were all plainly done with intent to terminate.

6.      Plaintiff was given no warning or notice before the suspension or the press release.

Defendants never even bothered to ask him if he was anywhere near the Capitol Building before

they defamed him and unjustly suspended him for a false and defamatory reason.

7.      At a January 8, 2021 meeting, Plaintiff informed Defendants he had been nowhere

near the Capitol Building and that what they were saying was false. Despite this, Defendants, due

to ideological hatred for Mr. Moorehead, refused to issue any correction or retraction and

refused to unsuspend him—to this day the defamation is uncorrected. As a result the community

and nation were poisoned against him and believed that he had attacked the Capitol Building on

January 6, 2021.

8.      Defendants kept him suspended for the next 6 months while desperately trying to

come up with some sort of justification for their outrageous conduct to terminate him. They even

demanded all his devices trying to forensically search them to find a basis on which to fire him.

There was nothing.

9.      What Moorehead did not know was that Defendants were at all points acting as a

secret arm of the FBI. When Plaintiff was interrogated on January 8, 2021, it was at the behest

and direction of the FBI. He was never informed of this fact, and was never informed of his right

to counsel and against self-incrimination. When the District seized his devices, it was to have the

FBI search the devices. It is utterly outrageous that a governmental employer would so utterly

and completely subvert their employee's constitutional rights and place him in criminal jeopardy.

10.    Mr. Moorehead and his family's safety was imperiled by Defendants' defamation, and he received terrifying harassment, including a vicious death threat and a voicemail that someone was going to come to his family's house to "educate him."

11.    As his baseless suspension continued, the defendant Board and its members, motivated by ideological hatred for Mr. Moorehead, colluded to further attack and knowingly defame him. Defendants Lisa Conover and Phoebe Harris worked with a community group on which Conover also sat on the board (and which is an official ASD partner) to defame Mr. Moorehead at February 11, 2021 board meeting as an insurrectionist, terrorist, and a racially biased teacher. This was an utterly outrageous action taken by the Board to retaliate against Moorehead.

12.    In July 2021, after six months of baseless suspension, Defendants privately admitted to him in a letter that they knew he had not rioted or attacked the Capitol Building. They then said they would reinstate him, but conditioned his reinstatement on Mr. Moorehead taking cultural competency courses regarding African Americans and Hispanics. This requirement was baseless and never explained.

13.    Reinstatement, however, was impossible. Defendants had not only betrayed Mr. Moorehead and violated his most basic constitutional rights, but they created an overtly hostile and unsafe work environment which made his return impossible. Defendants also maliciously refused to publicly correct or retract their defamatory statement which they admitted was not true.

14.    Defendants themselves later admitted that the false accusation that he attacked the Capitol Building had poisoned the school district against him—a falsehood Defendants had

spread and refused to correct; the reinstatement was a sham, a tactic meant to try to force Plaintiff to resign. The District was clearly hoping to force Moorehead to resign so they could claim he voluntarily left.

15.    Mr. Moorehead explained to Defendants that they had made his return impossible, especially the egregious failure to correct or retract the false accusation that he had attacked the Capitol Building, and that he would not take cultural competency courses not required of any other teacher as if he had done something wrong.

16.    Mr. Moorehead refused to resign as he had done nothing wrong. Moorehead instead implored Defendants to do the right thing and find an amicable solution that allowed the parties to part ways since Defendants had irrevocably broken the employment relationship.

17.    Defendants, however, were not interested in publicly retracting their egregious defamation of Mr. Moorehead or resolving the situation amicably, because they view Mr. Moorehead as a political opponent. Instead, they, in bad faith, initiated termination proceedings against him for the pretextual reason that he allegedly refused to show up to work. Defendants ignored that a return to work was impossible because they had made it unsafe, manifestly hostile, and they had betrayed Plaintiff and broken the employment relationship.

18.    Defendants then engaged in a six-month long dismissal process, which was utterly biased and predetermined. This process wholly ignored the vicious and illegal attacks by Defendants which made it impossible for Mr. Moorehead to return to ASD.

19.    Mr. Moorehead was finally terminated at the July 28, 2022 Board Meeting in a 9-0 vote. Mr. Moorehead addressed the Board at the meeting and called them out for their shameful behavior, noting that they had spread lies about him, refused to correct the defamation, poisoned the community against him, made it unsafe to return, and had destroyed his life.

20.    Defendants' actions unambiguously violated Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights, and the Collective Bargaining Agreement.

21.    Needless to say, had Mr. Moorehead been a black or Hispanic teacher who attended a BLM rally at which violence occurred over 1 mile away, and espoused left-wing sentiments Defendants agreed with, none of this would have happened.

*****

## Background

22.    Plaintiff Jason Moorehead taught at Allentown School District for 18 years as a social studies teacher at Raub Middle School.

23.    He is originally from Seattle, but moved to Allentown to become a public school teacher.

24.    Allentown is majority Hispanic and black and is a disadvantaged community. Teaching in the school system there has challenges and the turnover rate for teachers is high.

25.    Mr. Moorehead, however, thrived in that environment and has a spotless record. He always served Allentown with pride and distinction.

26.    Mr. Moorehead is also a conservative republican and supported Donald Trump. This was not a fact he advertised because the public school system, and especially Allentown, is overwhelmingly comprised of liberal Democrats who have demonstrated hostility for Republicans, conservatives, and supporters of Donald Trump.

27.    This goes especially for the administration and Board of defendant Allentown School District.

**Defendants Suspend Plaintiff Jason Moorehead without Notice with Intent to Terminate and Publicly Defame Him**

28.     Following the 2020 general election, and claims of voting improprieties, Plaintiff traveled to Washington, D.C. to listen to the speeches at the rally at the Washington Monument by President Donald Trump and other speakers.

29.     After listening to the speeches, he got a hot dog from a street vendor near the Monument, and then boarded a bus back home to Allentown.

30.     At all points he was over 1 mile away from the Capitol Building.

31.     The morning of January 7, 2021, Plaintiff was called by defendant Anthony Pidgeon without notice or warning and told not to come to work "because of yesterday." He did not know why. Plaintiff then received an email from Pidgeon at 11:47 am telling him that this was based upon "serious concerns about your involvement in the civil unrest that occurred at the United States Capitol Building" and that they were investigating his involvement. See Exhibit 2. No one asked him if he had been at the Capitol Building, and Plaintiff figured he would explain that he was not there at a meeting he had been told was occurring on January 8, 2021.

32.     Later on January 7, 2021, without ever asking him about what happened, Moorehead was stunned when defendant superintendent Thomas Parker sent out a defamatory and false press release on social media claiming:

> January 7, 2021
>
> Dear Allentown Families, Staff & Community:
>
> On January 7, 2021, the Allentown School District (ASD) was made aware of a staff member who was involved in the electoral college protest that took place at the United States Capitol Building on January 6, 2021.
>
> We understand that many members of our community are upset by the image. At the same time, the district has an obligation to respect the First Amendment rights of our staff and students.

> Because of the emotion and controversy stirred by the events of the January 6, 2021, the teacher has been temporarily relieved of his teaching duties until the School District can complete a formal investigation of his involvement.

Exhibit 1 - Defamatory Parker/ ASD Press Release.

33.     The Spanish version of the press release stated that he had "participated" in the protest at the Capitol Building. Id.

34.     The false facts in this statement were that (1) Moorehead was at the US Capitol Building on January 6, 2021, and (2) he was involved in and participated in the protest at the Capitol Building.

35.     Parker and the other Defendants blasted this press release out on multiple District Facebook accounts and Twitter to millions of people on social media.

36.     At no point did they consult Plaintiff or ask him if the accusations made in the press release were accurate and truthful. It was plain that the suspension was done with intent to terminate.

37.     Moorehead was nowhere close to the Capitol Building and had not participated in the violence there; he was at all times peaceful and law abiding.

38.     Although not mentioned specifically by name, the Press Release was in fact about Jason Moorehead. Mr. Moorehead was easily identifiable as the teacher by the readers of the release, and many social media users in fact identified him on the School District's social media pages in the comment sections, and in posts of their own. See Exhibit 55 - Raub Middle School Facebook Posts. There was also no other teacher in the Allentown School District who had attended the rally.

39.    Defendants knew before and after the press release was published that the public was identifying Jason Moorehead as the subject of the press release.

40.    As a result of the press release, Mr. Moorehead was publicly and falsely identified as a participant in the Capitol Building riot by his own employer. The public in fact believed the false statements about Jason Moorehead which was and continues to be extremely injurious to his reputation and career.

41.    The Collective Bargaining Agreement to which Plaintiff was a party provides in Article 10 that "Any criticism by an administrator or Board Member of a Member of the Bargaining Unit shall be made in confidence and not in the presence of students, parents, or at public gatherings." Exhibit 21 - May 4 & 25 Emails, with Collective Bargaining Agreement, Article 10, Section F.

42.    Defendants knew about this provision in the CBA; it is a basic protection provided to teachers which Defendants knew they should not violate.

43.    The false and extremely public accusation that Moorehead had been present at and involved in the Capitol Building riot was a betrayal of Mr. Moorehead which broke the employment relationship.

44.    Defendants so wantonly violated this basic protection out of animus for Mr. Moorehead's political viewpoints, ideology, and political affiliations. Had a liberal or Democratic employee been at issue Defendants would not have rushed to push out public criticism of that employee, nor would they have pushed out a false accusation and suspended the employee without even consulting with the employee.

**Defendants' Defamation of Plaintiff Goes National; Defendants Held a Meeting where Plaintiff Informed them they Falsely Accused Him, after Which Defendants Again Publicly Accused him of Rioting at the Capitol Building**

45.     As noted, on January 7, 2021, Plaintiff was notified that a meeting was to take place on January 8, 2021, at 1 pm with the School District. What Mr. Moorehead did not know was that beginning on the morning of January 7, 2021, the District was secretly participating in an FBI criminal investigation of Mr. Moorehead.

46.     When Mr. Moorehead woke up on the morning of January 8, 2021, he learned that the Allentown Morning Call, the major paper for Allentown, had published a story based on the press release—with the paper's own additions—stating that he had attacked the Capitol Building. See Exhibit 4 - Jan. 8, 2021 Morning Call Article. Although not specifically named, he was in fact widely identified as the referenced teacher.

47.     Plaintiff was reeling and could not believe that his life and career were being destroyed over a lie that Defendants had never even bothered to ask him about.

48.     The Morning Call article was blasted out all over national media—including the New York Post, Politico, and many many other outlets—which repeated the District's assertion that Plaintiff had been suspended for being at the Capitol Building and participating in the violent riot:

> Pennsylvania teacher suspended, others lose jobs over Capitol riot
>
> A Pennsylvania teacher was suspended this week *after taking part In Wednesday's riot* at the U.S. Capitol, pending an investigation, the Allentown School District said, according to a report.
>
> The unnamed educator was among a number of people who have reportedly been fired or asked to resign from jobs *after being identified as a Capitol rioter, The Morning Call in Allentown reported*.

"Pennsylvania teacher suspended, others lose jobs over Capitol riot," FoxNews.com (January 8, 2021), https://www.foxnews.com/us/pennsylvania-teacher-suspended-others-lose-jobs-over-capitol-riot (emphases added).

49.    Before the 1:00 pm meeting Moorehead was sent a <u>Garrity</u> Notice by the District Solicitor. <u>See</u> Exhibit 3 - <u>Garrity</u> Notice.

50.    The purpose of the <u>Garrity</u> Notice is to warn an employee that he must answer narrow questions as part of a disciplinary proceeding related to his official duties, and inform him that his statements cannot be used against him in a criminal proceeding. However, Moorehead was never informed that he was already under criminal investigation, nor did he have any idea that he was actually being interviewed by the FBI. Clearly, the <u>Garrity</u> protections were illusory. The fact that the District gave a <u>Garrity</u> warning while acting on behalf of the FBI during a secret criminal investigation completely obviates the purported protections provided by a <u>Garrity</u> notice

51.    When he appeared via Zoom for the meeting at January 8, 2021, the District Solicitor was present as well as defendant Tony Pidgeon. They did not disclose that they were asking questions on behalf of the FBI, nor was he told of his right against self-incrimination nor of his right to counsel.

52.    Plaintiff explained to Defendants that he was not at the Capitol Building riot and was at all points over 1 mile away from the Capitol Building on January 6, 2021.

53.    Defendants appeared completely unaffected by his assertion that he was nowhere near the Capitol Building. The impression the questioning gave him—asking who was on his bus and if he knew names—was that it had been decided he was at the riot and that they wanted to know if he had "accomplices."

54.    The questions were not narrow, nor were they related to his official duties, as required by <u>Garrity</u>.

55.    Then, after the meeting, at around 5 or 6 pm, the Morning Call story was updated. The updated story now contained comments from Defendants, stating:

> "The district is taking the matter seriously and has started the process of investigating the extent of the teacher's involvement [in the Capitol Building riot], district solicitor John E. Freund III said."

Exhibit 4.

56.     As noted above, although Moorehead was not identified specifically by name in the article, he was readily identifiable as the reference teacher and was in fact identified as such by members of the public.

57.     This statement was false and told the reader both directly and through implication that Moorehead was at the Capitol Building and had been involved in the Capitol Building riot, and that all that remained was to determine the extent of his involvement in the riot. Defendants, however, knew from the 1 pm meeting that the extent of Moorehead's involvement was that he was nowhere near the Capitol Building and was never part of any violence.

58.     Defendants, by and through the District Solicitor, were also quoted as saying:

> "The district has to balance the employee's right to free speech and association, against teachers' duty not to participate in or advocate un-American or subversive doctrines," he said, referencing the Pennsylvania public school code.

Exhibit 4.

59.     Section 1122 of the Pennsylvania School Code lists the exclusive grounds on which a tenured teacher can have his contract terminated, one of which is advocating and participating in un-American or subversive doctrines.

60.     By publicly claiming that Moorehead participated in or advocated un-American and/or subversive doctrines, Defendants again told the public that Moorehead had participated in a violent protest at the Capitol Building, which is false and defamatory.

61.     The reference by the Solicitor to the section of the School Code which permits termination of a teacher further demonstrates that the suspension was done with intent to

terminate, if that was not already obvious from the defamatory statement put out by Parker on January 7, 2021.

62.    This given justification for Defendants' discipline against Moorehead—advocation and participation in un-American and subversive doctrines—is also unconstitutional free speech retaliation.

63.    Since <u>Brandenburg v. Ohio</u>, <u>Tinker v. Des Moines</u>, <u>Texas v. Johnson</u>, and <u>U.S. v. Eichman</u>, laws prohibiting advocacy of so-called un-American and subversive doctrines have been struck down as unconstitutionally prohibiting protected speech and related rights.

64.    Such laws are only valid to the extent they are narrowly tailored to forbid unprotected speech, such as imminent incitement to illegal activity, and are otherwise void for overbreadth and vagueness.

65.    As noted *infra*, Plaintiff asks that section 1122 of the Pennsylvania school code be declared unconstitutional for (1) permitting viewpoint discrimination, and (2) for being overbroad and vague, all in violation of the United States Constitutions.

66.    In other words, Defendants' statements to the Morning Call that Moorehead had been suspended for participating in and advocating un-American or subversive doctrines by being present at and involved in the Capitol Building riot were not only factually false, but admitted suspending Plaintiff for a blatantly unconstitutional reason.

**Defendants Refuse to Correct the Defamation of Plaintiff, Causing Permanent Harm to His Reputation and Career, and Endangering the Safety of Him and His Family**

67.    Despite being notified on January 8, 2021, that Plaintiff was at all points over 1 mile away from the Capitol Building on January 6, 2021, and not involved in any violence, Defendants never publicly corrected the false and defamatory statements they made about Jason

Moorehead. Defendants could have easily ascertained Moorehead's whereabouts on January 6 or 7, but deliberately chose not to. These public statements were also in violation of the CBA prohibition on public criticism of teachers.

68.    As a result of Defendants' failure to correct their defamation of Plaintiff, the school, students, parents, community, and nation believed that Plaintiff had rioted at the Capitol Building on January 6, 2021, and was a criminal.

69.    Plaintiff demanded over and over that Defendants correct the defamation, but Defendants refused to do so:

> Every day your client keeps the unambiguously defamatory press release on its website and social media accounts—and refuses to issue a correction—is more proof of malice. You have never provided any facts to establish that Mr. Moorehead was anywhere near the Capitol Building— and you never bothered to talk to him before blasting him in the press. Furthermore, after talking to him on Jan. 8, you never corrected the false press release. You have also never even explained why it is not being corrected.

Exhibit 10, at p.1; see generally Exhibits 5-10.

70.    Defendants' public defamation of Plaintiff, their refusal to correct the defamatory statements, their refusal to immediately unsuspend him, their further defamation of Plaintiff even after his denials, and their violation of the CBA prohibition on public criticism, made it abundantly clear that he could not return to his position and almost certainly his career in education.

71.    To attempt to correct the record and mitigate the harm Defendants were causing, Plaintiff appeared on television several times to try to correct the narrative, but many believed that he was lying and that Defendants' false public statements about him were truthful.

72.    Mr. Moorehead also received incredibly disturbing and threatening voicemails—several of which can only be described as psychotic—which violently threatened to come to his house to "educate him" and which made him, his wife, and their two young children fear for their safety. The callers' vitriol included the following accusations, threats, and insults:

- Accusing him of "lying" that he had not been at the riot
- Claiming he was "participating in a coup,"
- Stating that he should be "teaching those kids to be good kids not racist white supremacists,"
- accusing him of being a "white supremacist,"
- calling him "Racist piece of shit,"
- threatening him "I come down your house, I find you, I educate you, you dumb piece of shit,"
- calling him an "insurrectionist,"
- stating he "attacked the capitol,"
- stating "you got suspended because Allentown School District needs to do an investigation to fully understand your participation on [sic] the insurrection on January 6, you stupid motherfucker, Jason, you're dumb, you should get your teaching licenses revoked, you should be put in jail, you are a piece of shit,"

73.    In addition to the voicemails he was sent an explicit death threat on January 23, 2021:

>    Subject: You fucking scum
>    You scum sucking cunt.....The PA Resistance has stated that moorehead
>    will be sentenced to execution and found guilty soon.
>    He is a lying insurrectionist and they have said "he's a dead man!!!"

Exhibit 6.

74.    Mr. Moorehead filed a report with the State Police to protect himself and his family. This was also necessary because Mr. Moorehead was doxxed and his personal information posted online.

75. He added security cameras, covered his windows, and isolated his family to protect them from those seeking to harm them.

**Defendants, including Defendant Board Members Lisa Conover and Phoebe Harris, Collude with Leftwing Community Organizations to Defame and Attack Plaintiff at a February 11, 2021 Board Meeting**

76. Despite knowing that Plaintiff had not been at the Capitol Building Defendants refused to retract the defamation and reinstate him—and instead further publicly attacked him because of their left-wing politics and ideological hatred for Republicans and conservatives.

77. After Mr. Moorehead publicly stated to news programs that Defendants' assertion he was at the Capitol Building on January 6, 2021, was false—and members of the community spoke out in support of him at a late January 2021 Board Meeting—the defendant Board Members, especially Lisa Conover and Phoebe Harris, colluded to attack and retaliate against him because of their hatred for Plaintiff's political opinions and affiliations.

78. At this time in January and February 2021, defendant Conover was on the board of the community organization Promise Neighborhoods, which is an official partner of the defendant school district.

79. Conover and Promise Neighborhoods started a Change.org petition on February 4, 2021, to the Allentown School Board, under the hashtag #protectourchildren, about Plaintiff:

> We the parents and neighbors are signing to oppose anyone that attended the storming of the capital in Washington. The actions of the rioters have left our students and families feeling unprotected in their classroom and we wonder how can we disrupt the school to prison pipeline when those that are paid to protect, educate and heal us support white supremacy.

Exhibit 16 - Attacks on Moorehead by Promise Neighborhoods. This appears to be the only Change.Org petition that Promise Neighborhoods had ever started.

80.     Pas Simpson, an acquaintance of Conover and Harris, is a leader of Promise Neighborhoods and was intimately involved in creating the petition, advertising it, and then attacking Plaintiff at the February 11, 2021 board hearing. Id.

81.     Promise Neighborhoods shared the Change.Org petition on February 4, 2021, on Facebook and stated "Please sign and share this petition as we prepare for the February 11th School Board Meeting." Id.

82.     The comments to the petition identify Mr. Moorehead by name, are vile, and demonstrate that the readers believed he had "stormed" the Capitol Building, such as this defamatory comment:

> White supremacists and terrorists do not belong in our country, let alone teaching children. The teacher from ASD who stormed the Capitol on January 6th in attempt to execute members of Congress and overthrow our government deserves to be fired and forever remembered as a traitor to our country.

Id.

83.     This petition was specifically started by Conover and Promise Neighborhoods to whip up the community and local activists in advance of a February 11, 2021 board meeting, so that that they would defame and attack Plaintiff at the board meeting using the defamatory lies Defendants had been spreading about Plaintiff.

84.     Another left-wing community group named POWER Lehigh Valley closely connected to Promise Neighborhoods, Conover, and Harris shared the Change.Org petition on Facebook and stated, in part, "Jason Moorehead, the ASD teacher who participated in the riot at the Capitol" should not be reinstated. Exhibit 16.

85.    Defendants were aware of the Promise Neighborhoods petition, and the related social media posts by Promise Neighborhoods and POWER Lehigh Valley.

86.    On or around February 5, 2021, Promise Neighborhoods started a Facebook event for the Allentown School Board meeting on February 11, stating "Join us as we fight to provide a safe learning environment for our children. Sign the petition. Have your voice heard." This post was an attack on Jason Moorehead, and outrageously claimed that he could not provide a safe learning environment for children. Exhibit 16.

87.    Defendant board member Phoebe Harris shared the event created by Promise Neighborhoods on Facebook on February 5, 2021, demonstrating that all Defendants were aware of this campaign to have left-wing community activists attack Plaintiff at the board hearing using the defamatory lie that Moorehead had rioted at the Capitol Building. Id.

88.    All Defendants were aware of this social media campaign targeting and retaliating against Jason Moorehead in advance of the February 11 board hearing.

89.    At the February 11, 2021 board meeting, left-wing activists—at the instigation of Defendants, and in coordination with them—used lies Defendants had published about Moorehead to outrageously and falsely attacked Jason Moorehead. See ASD Feb. 11, 2021 Board Hearing, https://www.youtube.com/watch?v=02bMYoXUq-s.

90.    Defendant Conover chaired during the comment section of the February 11, 2021 meeting, so that she could control the public comment period at which she had arranged for community activists to defamatorily attack Plaintiff.

91.    **First**, Pas Simpson, a friend of Lisa Conover and Phoebe Harris, as well as a leader of Promise Neighborhoods, stated that his group had started a petition and gathered signatures showing that the community did not like Plaintiff and that educators should not be

engaging in "terrorism" and "white supremacy." Simpson, also stated that he wanted to give the comments from the Petition to the Board, which as noted above are vile and defamatory.

92.    It should be noted that this is pure theater as Defendants had colluded with Simpson and Promise Neighborhoods to start the petition and have Simpson and Promise Neighborhoods attack Plaintiff at the board hearing—based on Defendants' lie that Moorehead had stormed the Capitol Building. All the defamatory comments in the petition, the comments thereto, and at the meeting were caused by and are the responsibility of Defendants.

93.    **Second**, other commenters accused Moorehead of being present at an "insurrection." A woman named Enid Santiago stated "Make sure that man never, ever teaches BIPOC children in the school district of Allentown" and that Moorehead "took part in the attempt to overthrow our government, in our election, our democracy." She further falsely and baselessly accused Moorehead of harassing and treating students differently because of race.

94.    **Third**, a woman stated Moorehead reminded her of a "wolf in sheep's clothing. We have to take a stand, because if we don't take a stand, we're gonna allow this wolf out of the jungle and he will come and take our children."

95.    **Fourth**, another man accused Moorehead of attending an insurrection and that Moorehead was engaging in misconduct in the classroom, which could send a child "spiraling to prison or death."

96.    All Defendants, especially the presiding board member Lisa Conover, knew that (1) Moorehead had been nowhere near the Capitol Building and was not part of any violence, and (2) that in 17 years there had never been a single allegation of bias or misconduct against Plaintiff. Despite this, Defendants never corrected their previous defamation or cautioned the community.

They did not do so because they had pre-planned these attacks on Plaintiff and maliciously wanted their lies about him spread even further.

97.    At this point, the District Solicitor stepped in to caution the participants that not all facts about Plaintiff's "involvement" had been established. It should be noted that Defendants could have used this opportunity to publicly correct the record and inform the community that the District's Press Release, and the attacks on Moorehead, were false. They did not do this.

98.    Defendant Conover was not happy with the Solicitor's interruption given that she, Defendants, and Promise Neighborhoods had spent the last two weeks organizing the community to attack Plaintiff at this board meeting.

99.    She angrily asserted that she did not care about the Solicitor's advice, and that she was going to let the community speak their mind. Note that Conover herself had specifically arranged for the commenters to attack Moorehead based on a false accusation Conover knew was false.

100.    Defendant Harris—who had advertised on Facebook leading up to the meeting to encourage people to speak against Moorehead—then stepped in to support the attacks on Moorehead, furious that people had supported Moorehead at a prior board hearing: "Let's remember, 2 weeks ago, everyone got to speak, and so these parents want to speak now too, so let's give them the platform and not stifle what they want to say because we didn't do that 2 weeks ago." This makes it abundantly clear that due to political animus Defendants were upset at the truthful support shown for Plaintiff and had organized this meeting to perpetuate their false narrative and solidify the community's belief that he was at the Capitol Building, involved in the riot, and had engaged in un-American and subversive behavior.

101.    The community activists who were being used by Defendants to attack Moorehead heard the message from Conover and Harris loud and clear and further defamed Plaintiff at the meeting. A woman named Robyn Weaver stated: "Jason Moorehead has identified himself as a White Supremacist by his participation in the Capitol insurrection. And it is you know, your duty as educators in our community and as leaders in our community to hold him accountable and protect our children. We understand that traumatization occurs through racism and through white supremacy especially students of color experienced this on a daily basis. And, it's impossible to learn when you have that fight or flight response occurring constantly being around a person who you know through his participation in an insurrection does not believe that you are a full human, deserving of rights and love."

102.    Another community activist then attacked the Solicitor and demanded that he listen to the defamatory statements being made about Moorehead because people had spoken in support of Moorehead at the last board meeting. The activist then stated that "Jason Moorehead attended a failed coup where two police officers were murdered. He was among local, homegrown terrorists who travelled to the capital to intimidate, harm, and disrupt the national election. He teaches BIPOC children, and how the power to influence them, and has general power over them in this classroom. How many microaggressions has he gotten off his chest to our black and brown children?" He went on to say: "Your teacher is a walking liability."

103.    Further comments from another activist demanded that Plaintiff be fired because he attended a rally she disagreed with, and that children are unsafe around Moorehead in the classroom, and that Moorehead is guilty by association with politicians she disagrees with.

104.    A man named Will Strouse then commented. He claimed that Plaintiff had attended an insurrection, with proud boys, white supremacists and criminal domestic terrorists.

Mr. Strouse claimed that Plaintiff posted support of those groups. Mr. Strouse also claimed that Plaintiff lied, boldly and condescendingly on national television about his attendance at the riot. All of this was demonstrably false.

105.    At this point the District Solicitor stepped in and said that he was "concerned about defamation." Defendants, of course, knew that what was being said about Moorehead was false. Again, it should be noted that Defendants could have taken this opportunity to retract the false accusation that Moorehead rioted or had been at the Capitol Building, but did not do so.

106.    Defendant Conover, demonstrating wanton and intentional disregard for Plaintiff's rights and the truth, then stated to the Solicitor "Nobody's asking for counsel right now." Again, Conover did not want the ambush she set up being interrupted with cautionary instructions from lawyers warning against outrageously defaming an innocent employee.

107.    Strouse then continued, claiming that Plaintiff ""spouted these false narratives [on CNN], and showed no remorse while trying to cover his ass." Strouse stated that Moorehead "needs to be brought to justice."

108.    The Solicitor then interposed again and stated "There is a line here, Ms. Conover, between legitimate expressions about legitimate concern about the impression that has been made in terms of the effectiveness of this person as a teacher. There's a difference between that and defamatory statements about his character, and we shouldn't be tolerating that."

109.    Defendant Conover stated again, unhappy that the Solicitor was raining on her defamatory parade, that she was not asking for counsel, and that she is "okay with that, whatever comes out of it, let it come out."

110.    Because of political animus for Mr. Moorehead, no other defendant board member before, during, or after the board meeting intervened to stop what was happening

despite knowing that (1) Defendants had defamed Moorehead and that he had not attacked the Capitol Building, and (2) that Conover and Harris had arranged for these defamatory comments to be made about Moorehead at the board meeting.

111.    This type of intentionally illegal conduct from governmental officials is outrageous and corrupt. Conover, and all Defendants, are using their governmental positions to deliberately defame an employee they disagree with and destroy his teaching position and career.

112.    Additional speakers then denounced the Solicitor for allegedly coming to the defense of a "white supremacist," that Moorehead was guilty of treason, that he tried to overthrow the government, and that Moorehead should be arrested and charged with a felony.

113.    Conover then announced that she was going to call on a student. She then re-called her acquaintance Pas Simpson of Promise Neighborhoods;[2] the student was apparently on Pas Simpson's computer. This shows foreknowledge and coordination on the part of Conover with Simpson and Promise Neighborhood. Pas Simpson can be heard coaching the student in the background.

114.    The student in Simpson's house demanded that Moorehead be fired for attending a "protest of violence." After the student had demanded that Moorehead be fired, as the student went to continue speaking, Conover brusquely interrupted and said "That's it. Thank you very much."

115.    Clearly, Conover knew beforehand that this student was going to speak, and from which household. Then, when the student had stated what Conover wanted, Conover decided she was done, cut her off, and moved to the next speaker.

---

[2] Note that Conover bizarrely feigned as if she did not know how to pronounce Simpson's first same, despite knowing him well and serving on the board of Promise Neighborhood, an organization with Simpson helps run.

116.    Conover, Harris, Simpson, Promise Neighborhoods, and all Defendants did not even try to hide their orchestration of these false and defamatory attacks on Moorehead.

117.    Additional speakers then called for the Solicitor to be fired, stated that Moorehead was hearing a hood under his educator's hat, and called on Moorehead to be prosecuted as an accomplice in the Capitol Building riot.

118.    All Defendants participated, supervised, ratified, and acquiesced in the retaliatory and defamatory attacks on Plaintiff leading up to the February 11, 2021 board meeting, and at the board meeting itself.

**Defendants Request Plaintiff's Electronic Devices, Desperate to find Some Evidence of Wrongdoing; Defendants Hid from Plaintiff that the FBI was Searching his Devices**

119.    Defendants knew that their false statement and given reason for suspending Plaintiff was blatantly false. However, given their ideological hatred for Plaintiff, they refused to publicly correct the defamation—indeed, they amplified it.

120.    Plaintiff's counsel wrote to the District Solicitor and made it clear that press release had to be withdrawn and corrected immediately, and that serious due process violations were occurring. See Exhibits 5-10.

121.    To attempt to find some sort of cover for their ridiculous attacks on Plaintiff, they demanded that Plaintiff turn over his electronic devices to be searched in late January 2021. See Exhibits 11-12.

122.    Mr. Moorehead's counsel was told that if he turned over the devices, and there was no proof he was at the Capitol Building, the defamatory statement would be corrected and he would be reinstated (although the possibility and ability of reinstatement was extremely dubious). Exhibit 20.

123.    Mr. Moorehead's counsel was also falsely assured by Defendants' solicitor there was no criminal aspect to this request. Exhibit 13.

124.    What Moorehead and his counsel did not know, as described *infra*, was that the FBI was behind this request and was the entity searching his devices. This was an outrageous breach of his constitutional rights. Exhibits 17-18.

125.    The search of his devices found nothing.

126.    Plaintiff demanded that Defendants unsuspend him and correct the record as there was no factual or legal basis to suspend him, plainly with the intent to terminate him, and find an amicable way to separate since the employment relationship had obviously been destroyed. Exhibit 18 - April 1, 2021 Letter from Moorehead's Counsel.

127.    On April 9, 2021, Defendants then served him a putative Loudermill notice claiming that a hearing would concern his posting on social media on January 6, 2021, and whether he had requested a personal day using the correct procedure. Notably, the notice did not claim he was at the Capitol Building, which was the false and very public reason given for his suspension. Also notable was that Defendants never corrected or retracted their public defamation of him on January 7 and 8, 2021, nor their defamatory conduct at the February 11, 2021 board meeting. Exhibit 19.

128.    The content of the social media posts that Mr. Moorehead made on January 6, 2021, were squarely protected by the First Amendment and in no way warranted discipline or termination. See Exhibit 56. Indeed, as discussed *infra*, Defendants themselves admitted this basic fact when they purported to reinstate him on July 16, 2021.

129.    The 3-month delay between the initial unnoticed suspension and first Loudermill notice in April 2021 is inexcusable in this case and is itself a due process violation. The

government is not allowed to publicly defame an employee and suspend him indefinitely for a false reason, engage in months of a fake and unnecessarily drawn out investigation the result of which they already know, refuse to correct the false public statements, and refuse to provide him a Loudermill notice and opportunity to respond for 3 months. It makes a mockery of the due process requirements as laid out by the Supreme Court. See Barry v. Barchi, 443 U.S. 55, 66 (1979).

130.    This delay was extremely prejudicial as the given public reason for his suspension was un-American and subversive activities for participating in a riot at the Capitol Building, which is absolutely false and to this day remains uncorrected.

131.    Moreover, the delay was also prejudicial because by the time Defendants purported to reinstate Plaintiff, he had served six months of suspension, a grossly excessive penalty even assuming his social media posts were worthy of discipline. See Barry, 443 U.S. at 66 (stating that due process violation exists where employee immediately suspended without notice and defendant does not allow for prompt resolution of dispute, leading to full penalty being experienced by employee without due process: "Once suspension has been imposed, the [employee's] interest in a speedy resolution of the controversy becomes paramount, it seems to us.").

132.    Indeed, even suspending Moorehead without notice or hearing was unconstitutional and violated due process. Where a suspension is done with intent to terminate, it is viewed as a *de facto* termination and constitutes a deprivation to which due process protections attach. See Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008); Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011); Gniotek v. City of Philadelphia, 808 F. 2d 241, 243-44 (3d Cir. 1986) (stating that suspensions with intent to terminate are *de facto*

dismissals and due process protections attach).

133.     Only a strong government interest can justify the pre-hearing deprivation of a property right, usually related to public safety concerns, which are not implicated by this case. Even then the appropriate process must be provided immediately, which was also not done in this case; this is especially egregious because Defendants actually knew almost immediately the justification for the immediate suspension was baseless.

**Defendants Refuse to Correct the Defamation while Holding a Fake <u>Loudermill</u> Hearing**

134.     In response to the April 9 Loudermill notice, Plaintiff's counsel objected to the shifting goal posts and the refusal to correct the defamation on April 13, 2021. Exhibit 20. The devices were clean and the defamatory statement was supposed to be corrected; now the District was trying to premise the discipline on entirely different reasons.

135.     These new reasons were blatant pretext, and were not the reason given in the public announcement of his suspension. The reasons publicly given were that he had participated in the Capitol Building protest and was engaged in un-American and subversive conduct.

136.     Post hoc rationalizations of discipline are viewed as pretext and evidence of illegal discrimination. <u>American Freedom Defense v. Washington Metro.</u>, 901 F. 3d 356, 366 (D.C. Cir. 2018). Pretextual and insincere excuses to justify discrimination are to be disregarded. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)

137.     Plaintiff's counsel further stated "I've already made it clear Jason cannot return to Allentown because the District has made that an impossibility. No reasonable teacher in his position could return given the District's conduct." <u>See</u> Exhibit 20.

138.     Plaintiff's counsel also stated "the same biased administrators and Board Members who attacked him so clearly in violation of his rights should in no way be allowed to

participate, govern, or control any process going forward" and "If a fair process is to occur, it starts with the correction of the defamatory statement." Id.

139.    It was also noted that the CBA prohibited public criticism of a tenured teacher such as Plaintiff, which Defendants blatantly violated, causing Plaintiff to lose all trust in his employer. Id.

140.    When Defendants tried to move forward with a defective Loudermill hearing, Plaintiff again objected on May 4, 2021, for the same reason noted before. He again reiterated that "Mr. Moorehead cannot go back to ASD. The District's Actions and inactions have made this impossible." Exhibit 21.

141.    Plaintiff and his counsel repeatedly attempted to have Defendants recognize that their outrageous conduct, and betrayal of Mr. Moorehead, had constructively terminated him and made it impossible and unsafe for him to return.

142.    The District then held a so-called Loudermill hearing on May 5, 2021, without Mr. Moorehead present, focusing on the pretextual reasons for Moorehead's discipline.

143.    On May 24, 2021, counsel for Mr. Moorehead demanded a status update regarding the inexcusable delay as Mr. Moorehead remained suspended. Again, it was noted that "The fact of the matter is that the parties agree Mr. Moorehead cannot return to Allentown School District." Exhibit 21.

### The Fake Reinstatement Letter is Sent and Privately Admits that Plaintiff was Not at the Capitol Building Riot

144.    After over six months of being suspended for a false and defamatory reason, the District finally wrote a letter on July 16, 2021, admitting he had been nowhere near the Capitol Building:

> After fully investigating your involvement in the events of January 6, 2021, in Washington D.C., the district has concluded that your presence at the January 6th gathering did not violate School Board policy 419 relating to teacher non-school activities.

Exhibit 22.

145.    Notably, although Defendants now were privately admitting Plaintiff had not attacked the Capitol Building, they never publicly corrected or retracted the false statements on January 7, 8, and February 11, 2021, as Mr. Moorehead had been requesting for 6 months—and still have not done so as of the filing of this complaint.

146.    The letter did admonish Plaintiff for his social media posts claiming that they were offensive. Note that this given reason is pretextual as explained above, and also violates the First Amendment. His out-of-school speech is protected by the First Amendment.

147.    Nothing about these posts warranted suspending him for six months, and these posts were not the true reason he was suspended and disciplined. Basically, instead of doing the right thing, the district had kept him suspended for six months while they tried to figure out how to avoid liability and correcting the defamatory statements.

148.    It should be noted that the fact that Defendants purported to reinstate him is an admission that nothing about his speech justified terminating the employment relationship *in their own view*, including any putative disruption.

149.    The letter then nonsensically said Defendants would reinstate him if he took "cultural competence" classes on African American and Hispanic history.

150.    This baseless condition on his reinstatement demonstrates the ideological and political motives for his discipline, the public attacks on him, and the refusal to correct the defamation and disinformation Defendants spread about him. It also indicates that the

reinstatement was a sham, since there is no way that Plaintiff would have ever agreed to this poison pill.

151.    The topics of these classes have nothing to do with Moorehead's alleged disciplinary violations. In Defendants' minds, even though they had no legal basis to fire him, he is a racist conservative who must reeducated. They also wanted an excuse to put this letter in his disciplinary file.

152.    The letter also said that he was being removed from his position at Raub Middle School and his new position and location would be later determined. In essence, this purported reinstatement was not actually reinstating him as a teacher, but instead was an attempt by Defendants to pretend to reinstate him so they could claim they had not retaliated against him or failed to provide him due process.

153.    This letter was a nonstarter. Plaintiff's counsel wrote to the district on July 30, 2021:

> As we discussed on the phone, Mr. Moorehead is rejecting the District's proposal. The proposal does nothing to correct the false information that was disseminated about him. Furthermore, he was falsely labeled a racist, a bigot, and an "insurrectionist." He is not going to be forced to take diversity training classes as if he did something wrong. The truth is that the District has made it impossible for Mr. Moorehead to return to the school district. He would be returning to the most hostile working environment imaginable in the current political climate.

Exhibit 23.

154.    Counsel's response concluded, "In sum, trying to reinstate him, after leaving him suspended for over half a year following destroying his reputation and ability to teach in the community, is not going to fix this." Id.

155.    Defendant Pidgeon ignored this letter from Mr. Moorehead's counsel and again demanded on August 9, 2021, that Plaintiff return to work, falsely claiming that Plaintiff had never responded. Defendant Pidgeon exhibited a pattern of ignoring that Mr. Moorehead was represented by counsel, and made false claims that Moorehead had refused to respond to letters when in fact he had done so through counsel. These petty bureaucratic games by defendant Pidgeon to prejudice Moorehead's rights are further evidence of malice and animosity by Defendants toward Plaintiff.

156.    Plaintiff himself then wrote to defendant Pidgeon on August 16, 2021, rejecting the District's absurd demands and attempt to gloss over what happened:

> There is no way that I can return to the Allentown School District given the way the District has publicly vilified and defamed me, poisoned the community against me, put me and my family's safety in jeopardy, and never corrected the record.
>
> I was a 17-year teacher with no discipline or complaints. Yet, on January 7, 2021, without even speaking with me, the District publicly and falsely claimed that I participated in the violent riots that took place at the US Capitol Building on January 6th, and suspended me indefinitely. The District told the media that the basis for my removal was that I had engaged in un-American and subversive conduct. This is flatly unconstitutional and factually false. I was nowhere near the Capitol Building and did nothing wrong.
>
> I was given no notice or chance to defend myself, which is also unconstitutional. These attacks on myself also directly violated the Collective Bargaining Agreement which only allow teachers to be disciplined for just cause and prohibits the District from publicly criticizing teachers. Worse, the District has known since January 8th that I was never near the riots, yet they have deliberately remained silent and refused to correct the record.
>
> As a result of the District's inexcusable conduct and omissions, I was verbally attacked at school board meetings and slandered mercilessly on social media. My private address and phone number was posted. *I received death threats and other threatening phone calls. My wife and kids were scared senseless.* We had to install security cameras and file police reports. This has turned my world upside down.
>
> Because of the District, the community and school think that I participated in a dark moment in American history and they hate me for it. Google my name and look what pops up.

You now send me a letter which pretends as if the last 7 months did not happen. Your letter only states that I will be reinstated to a different school if I take sensitivity training- as if I did something wrong. I cannot state strongly enough that I reject what you and the District are trying to do.

You cannot pretend as if you did not illegally destroy my life and career.

. . . .

Every relationship is built upon trust. You destroyed the trust I had with my students, parents, and the community. You have made it impossible for me to trust the District; how can I return to an employer who has defamed me, will not correct the record, and has no concern that it illegally violated my rights? You have created a hostile work environment.

Accountability matters. The District and Board need to publicly post an apology on the website and social media unequivocally correcting the record and clearing my name, and send the apology to the newspapers and news stations in Allentown. They also need to send an email to all students, parents, teachers, administrators, and staff doing the same. There also needs to be mandatory training for all staff and Board Members on free speech and due process so that this never happens again

Exhibit 25.

157.    He could not return to the District. This had been explained for months, but the District ignored it. It would be the most hostile environment possible, not the least of which because Defendants were intent on never correcting the defamation. Defendants had broken the employment relationship beyond repair and constructively terminated him. Plaintiff also refused to take Stalinist reeducation classes, as if he did something wrong or racist.

158.    Furthermore, they did not even specify what position he was being placed in, since the District knew it was impossible for him to be placed in Raub Middle School where he had taught for 17 years. In reality, there was nowhere in the District Plaintiff could be placed given the lies spread about him by Defendants due to a hostile and unsafe environment.

159.    Defendants' tact was clear: Defendants were trying to avoid taking responsibility for the situation they created, they were ignoring that Moorehead cannot return to the District,

and they were trying to prejudice Plaintiff's rights by forcing him to take classes to signal he did something wrong.

### The District Acted as a Secret Arm of the FBI, Violating Plaintiff's Constitutional Rights

160.    Unknown to Plaintiff at this time, the violations of his rights were much more severe than he realized.

161.    Specifically, as of the morning of January 7, 2021, the District was secretly working with the FBI. At the January 8, 2021 meeting, although the District solicitor was asking the questions, the questions were in fact from the FBI. The facts establishing this are outlined below.

162.    Mr. Moorehead's own employer was acting as a secret arm of the FBI without informing him of his constitutional right against self-incrimination, by providing him a misleading Garrity notice, and by failing to inform him that he was being questioned as part of ongoing criminal investigation he did not know about. See Exhibit 3 - Garrity Notice. This is absolutely shocking.

163.    As Defendants realized they had defamed Plaintiff, but did not want to correct it, they were desperately trying to find a way to justify their horrible attacks on Plaintiff.

164.    Thus, from late January to March 2021, they demanded Plaintiff's electronic devices for inspection. Exhibit 11-15. Plaintiff was told that if they were clean, the District would clear his name. Exhibit 20.

165.    In actuality, the District had only asked for the devices so the FBI could search them, trying to find something to incriminate Mr. Moorehead. Again, he was not informed of his

4th or 5th Amendment rights against self-incrimination, unreasonable search and seizure, or his right to counsel.

166.    The testimony at the Board Hearing established that high-level District officials drafted, compiled, and kept a special, secret 299-page HR binder relating to an FBI inquiry to Mr. Moorehead, separate and apart from his regular HR file. Exhibit 43 - Day 1 Transcript, at p.167-172.

167.    Plaintiff is entitled to examine his HR file and binders, and the results of the investigation against him. At the Board Hearing, the Hearing Officer (the new solicitor who represents the defendant Board and Board members) ordered Defendants to produce the binder or a detailed privilege log of those parts over which privilege was being asserted. See Exhibit 36 - Dec. 9, 2021 Hearing Officer Memorandum. Defendants refused to produce this HR binder spuriously claiming privilege and unjustifiably produced a 1-page conclusory privilege log, which Plaintiff pointed out violated the officer's order. Exhibit 44 - Privilege Log for Secret HR File; Exhibit 48, at p.1. Indeed, Defendants even refused to present the binder for *in camera* inspection to the hearing officer to verify whether the claim of privilege was valid—despite being ordered to do so. Exhibit 49, at p.58-59, 65-67.

168.    The claim of privilege is baseless because although the District Solicitor compiled the report, it was an HR product compiled in his role as an appointed investigator, not as an attorney. It is not attorney-work product and it is also believed that it was shared with third parties, including on information and belief the FBI.

### Facts Establishing the FBI's Involvement

169.    The FBI's involvement and coordination with the district is known for several reasons:

a. **First**, defendant Anthony Pidgeon (then the executive director of HR) testified that he was generally aware of the FBI's involvement from defendant Ramos, and attorneys John Freund and Brian Taylor. Exhibit 43, at p.161, 173:8-20 (stating that he had heard the FBI was involved in the investigation and that Ramos, Freund, and Taylor would have been the individuals who provided him that information).

b. **Second**, assistant superintendent defendant Jennifer Ramos testified at the board hearing that the FBI had called and left a message for the school district regarding Mr. Moorehead the morning of January 7, 2021. Defendant Ramos indicated that she then called and notified the superintendent, defendant Parker, the FBI had called. She testified that her and district solicitor John Freund called the FBI back later that morning, and that Mr. Freund thereafter liaised with the FBI as lead investigator. Exhibit 49 - Day 2, at p.101-11. Importantly, ***she was forced to admit that that the investigation by the District into Mr. Moorehead in fact started with the FBI inquiry***. Id. at p.111:19-22.

c. **Third,** when Mr. Moorehead was questioned by Mr. Freund on January 8, 2021, he was asked questions which very likely came from the FBI. For instance, he was asked if he recognized or knew the names of around 12-15 individuals. He truthfully replied he had no idea who they were. That night Mr. Moorehead saw those names on the television news; they were identified as connected with the Capitol Building riot. There was no reason for the school district to ask about these names, and in fact Garrity permitted only

narrow questions about Mr. Moorehead's job; the logical inference is that this was a law enforcement inquiry.

d. **Fourth,** on December 8, 2021, Mr. Moorehead submitted a FOIA/FOIPA request to the FBI for communications between the Allentown School District and the FBI relating to him, or documents relating to the Allentown School District, and also documents relating to any investigation into Mr. Moorehead. The FBI denied the request on April 22, 2022, and an appeal on August 11, 2022, not because there were no responsive documents, but because it claimed there was a pending investigation which exempted them from disclosure. See Exhibits 57-60 - FOIPA Requests and Responses.

e. **Fifth**, the metadata from the forensic review of Mr. Moorehead's devices indicates that it was done by specialized software supplied by Magnet Forensics. Federal spending records posted online by the government show that Magnet Forensics has been given $11.1 million in contracts with the Federal agencies from 2016 to 2023, including $2.41 million from the FBI. https://www.usaspending.gov/recipient/6da4cba7-98f3-9597-561e-7a456d9c61d7-C/all; https://www.usaspending.gov/search/?hash=42f0503336419b6b31d3bc42372d9308; https://investigate.afsc.org/company/magnet-forensics. In other words, in conjunction with the above evidence, the fact that Moorehead's devices were searched with Magnet software tends to show that the FBI or its contractor searched the devices.

f. Magnet also employs many former FBI agents, and markets itself as selling its products and performing work for federal agencies. https://www.magnetforensics.com/products/magnet-digital-investigation-suite/. It also markets its products as allowing governmental "Agency-wide digital investigation". Id.

**Defendants Move to Fire Plaintiff for a Pretextual Reason:**
**that He Did not Come to Work; Plaintiff Could Not Return to Such a Hostile Environment**

170. When Plaintiff would (and could) not return because Defendants had refused to correct the defamation of him, and his return was clearly impossible due to the hostile/unsafe environment, Defendants then stopped his pay on September 1, 2021, without warning.

171. On September 9, 2021, Plaintiff filed a writ of summons in Lehigh County Court of Common Pleas initiating this action, which was emailed to the District Solicitor and Pidgeon. Exhibit 26.

172. On September 14, 2021, defendant Pidgeon sent Plaintiff a letter purporting to be a Loudermill notice for his termination for failing to show up to work. Exhibit 27. Pidgeon did not send it to Moorehead's counsel and it was not seen for several days.

173. Pidgeon acknowledged that Moorehead had written a letter on August 16, 2021: "in which you stated that you did not believe that there is any way you can return to the Allentown School District. However, this letter did not state that you were resigning from your position as a teacher." Id.

174. The District Solicitor wrote in an email notifying counsel about Pidgeon's letter on September 16, 2021, that "Should Mr. Moorehead wish to submit his resignation, the

termination process and the required reporting to the Department of Education could be avoided." Exhibit 28.

175.    Again, Pidgeon's letter and the Solicitor's email—complete with threats—make it clear that Defendants were trying to force Plaintiff to resign, so they could claim he voluntarily quit.[3]

176.    Note well that defendant Pidgeon nowhere addressed or referenced the reasons that Moorehead listed about why he could not return—the refusal to correct the defamation and the unsafe and hostile work environment. As the executive director of HR, defendant Pidgeon should have been extremely attuned to these obviously legitimate concerns—which Pidgeon later admitted he was aware of—but he chose to ignore them out of convenience.

177.    Consider also that the reinstatement letter did not even specify an actual position for Moorehead to return to, making the demand to return farcical.

178.    Defendants' tact was clear: they had hoped he would resign so they could claim he voluntarily left and were not responsible for the harm they caused to him, which is why they did not correct the defamation and took half a year before making a decision. When he did not resign as they hoped, they then planned to "reinstate" him to an unspecified position, hoping that by purporting to reinstate him it would negate a claim that they had hurt his career. When Mr. Moorehead refused to play this game—as Defendants had made the District unsafe, hostile, and never corrected the defamation—it then moved to terminate him on the pre-textual ground that he "failed to show up to work" hoping that they could use this excuse to avoid liability for the egregious harm they caused Plaintiff.

---

[3] Of course, even if Plaintiff had quit, it would have been a constructive termination. There is no possible way for Plaintiff to return the hostile and unsafe environment created by Defendants.

179.    That this pretextual termination was predetermined is illustrated by the fact that Plaintiff's pay was stopped on September 1, 2021, weeks before the <u>Loudermill</u> notice was even sent. This alone is a pre-deprivation due process violation.

180.    The so-called <u>Loudermill</u> hearing took place on September 22, 2022. At that hearing, Moorehead's counsel extensively objected to the hearing both on substantive and procedural grounds. <u>See generally</u> Exhibit 31 - September 22, 2021 Loudermill Hearing Objection Transcript.

181.    It was extensively explained, with supporting exhibits, that Defendants had defamed Plaintiff, refused to publicly correct and retract the false statements, and that it was impossible for Moorehead to return to an unsafe and hostile environment.

182.    In other words, Defendants had poisoned the employment relationship to the point where Moorehead was already constructively terminated. No reasonable person would return to his position given the District's malice for him and the uncorrected defamation, and a manifestly unsafe and hostile environment existed. However, Moorehead was not going to resign as if he did something and allow the District to dishonestly argue that he voluntarily left.

183.    Instead, it was explained to Defendants, they needed to correct the defamation and amicably resolve the problem they had created, because Moorehead's return was out of the question. Note that Defendants knew the District had been poisoned against him, which is why they told him they were removing him from Raub Middle school in the first place.

184.    It was also explained that the process was biased and predetermined, including because his pay had been cut without notice on September 1, 2022, two weeks before the Loudermill notice was even sent.

185.    On October 12, 2021, defendant Pidgeon notified Plaintiff via a Statement of Charges that Defendants were going to be terminating him for "willful neglect of duties" for failing to report to his teaching assignment, and that a board hearing would take place. Exhibit 32.

186.    Note that the District had never actually given Mr. Moorehead any teaching assignment to return to, it was only vaguely stated that he had to return. The reinstatement was a sham.

### The Board Hearing Process Begins; It was a Pretextual and Biased Sham which the Board Did Not Even Participate In

187.    Under the Pennsylvania School Code provisions governing termination, the two courses going forward were to follow the grievance procedure or to appear before the Board. 24 Pa. CS § 11-1133.

188.    A Board Hearing must be "after full, impartial and unbiased consideration" both in process and in the adjudicator. See 24 Pa. CS §§ 11-1127, 1129.

189.    The grievance procedure was out of the question. The point of that procedure is meant to get the teacher reinstated. As Plaintiff had pointed out *ad nauseum*, it was impossible for Mr. Moorehead to return given the way he had been treated and the unsafe conditions.

190.    Mr. Moorehead, left with no other recourse, therefore began the board hearing process.

191.    From the very start, it was clear that nothing about the Board Hearing process was going to be fair, impartial, and unbiased as required by law, and was in fact a complete sham.

192.    On November 10, 2021, Plaintiff submitted a pre-hearing memorandum raising several issues:

Statement of Legal Issues

- Mr. Moorehead rejects the notion that this board hearing should be limited to "willful neglect of duties" due to the District claiming he failed to appear for school. This is a pretextual reason to cover up the unconstitutional and defamatory reasons he was suspended, subjected to a hostile work environment, and can no longer return to the school district.
- Not only is a return to the district impossible because of the overtly hostile environment, but upon admitting that Jason did nothing he was accused of, the District refused to correct the record and then placed unconscionable and unacceptable conditions on Jason returning to his employment—ignoring that it would be placing Mr. Moorehead in an unsafe environment.
- The hearing is predetermined.
- The Board is biased and not impartial, and has a substantial interest in the outcome of this matter including but not limited to because a lawsuit is currently pending against it and its members.
- The hearing officer is biased and not impartial being employed by the Board and District.

## Supplemental Legal Issues
- The false statement made about Jason which created an irrevocably hostile work environment he cannot return to.
- The illegal viewpoint discrimination that occurred and continues to occur has not been addressed.
- The due process violations that occurred and continue to occur have not been addressed, including the outrageously defamatory statements that have not been corrected.
- The District and Board refusing to acknowledge or correct Mr. Moorehead's constitutional grievances, and instead unilaterally demanding he admit to wrongful conduct and return to an unsafe environment, and then trying to pretextually fire him for not appearing for work.

Exhibit 35.

193.    Plaintiff also listed the Board Members as witnesses and asked for subpoenas to be issued to compel their testimony. Id.

194.    A pre-hearing conference took place on November 12, 2021. At that hearing, the new district solicitor, Jeffrey Sultanik of Fox Rothschild, presided over the conference, while the prior district solicitor, John Freund from the firm King Spry, acted as counsel for the District.

195.    Sultanik refused to allow the conference to be recorded. He then stated that he would be presiding over the Board Hearing as the hearing officer, and that the board would not

even attend the board hearing. Instead, he would make a recommendation the board would vote on.

196.    When Sultanik was asked how he could possibly be a fair and impartial adjudicator when he had just been hired as the District solicitor (representing the Board and the administration), he denied at length the board and its members were his clients, before finally admitting that they were in fact in his clients. He also admitted that the District administration was his client, but nonsensically said that for this particular hearing he would not be representing them.

197.    It is positively absurd to pretend that the District administration's and Board's own attorney could be a fair, impartial, and unbiased hearing officer when he had financial and professional duties as a lawyer to protect the District administration and Board. These are severe, unwaivable conflicts of interest.

198.    Plaintiff's counsel pointed out that not only was the hearing officer biased, but the School Board itself was extremely biased and should not be hearing or voting on this matter. The Board and its members had been sued and had a financial interest in this litigation, it had allowed the defamation of Mr. Moorehead to go uncorrected, several board members had expressly participated in whipping up the community against Mr. Moorehead, and they had allowed him to remain suspended for half a year without any actual basis—and were now trying to fire him for a pretextual reason.

199.    Sultanik absurdly stated that because Moorehead had not elected to follow the grievance process under the Collective Bargaining Agreement that he was not entitled to a fair and impartial Board Hearing. This was reiterated throughout the hearing process by Sultanik and in his final recommendation.

200.    This position is bizarre and unconstitutional. Regardless of whether an employee elects to follow the grievance process or go through a board hearing, the constitution requires that both procedures be fair, impartial, and unbiased. The hearing officer (again, actually just the Board's lawyer) claiming that a board hearing does not have to be fair or impartial is a blatant violation of § 1129 and the US constitution.

201.    Plaintiff's counsel also pointed out that the School Code requires a ***Board*** Hearing. Nowhere is the Board permitted to designate its own attorney to hear the matter in absentia. Plainly, the defendant Board and its members did not want to be confronted with its atrocious conduct, or be called to testify. The biased hearing officer, who is the Board's own attorney, also refused to issue subpoenas to compel the board members to testify; he was shielding them in his role as their counsel.

202.    The fact that the Board members were not present demonstrates that the decision was pre-determined.

203.    In summation:

   a.   the allegedly neutral hearing officer is the Board's own attorney,

   b.   the Board did not even hear the matter,

   c.   the hearing officer/Board's attorney would not compel the board members to testify,

   d.   the hearing officer/Board's attorney was the fact-finder gauging witness credibility since the Board was not present for the "Board Hearing,"

   e.   the hearing officer/Board's attorney made the termination recommendation, and

   f.   the hearing officer/board attorney ruled that Plaintiff is not entitled to a fair, impartial, and unbiased board hearing as required by the School Code and US and PA constitutions.

204.    Counsel for Plaintiff again expressed objections to the biased, and frankly absurd, nature of this hearing on November 18, 2021. Counsel also objected to the pretextual nature of the attempt to fire Plaintiff and the impossibility of returning to work due to the hostile and unsafe environment. Exhibit 25.

205.    These concerns were dismissed out of hand, and unfair and biased limitations were imposed on the hearing process. For instance, at the conference, it had been agreed that Plaintiff would present evidence and testimony on bias before the hearing took place. Following the conference, Sultanik then decided that only briefing on bias would be permitted.

206.    Furthermore, Plaintiff subpoenaed the board members and other witnesses to establish bias and that this termination was pretextual. Exhibit 37. These subpoenas were denied as irrelevant and "blatantly unrelated." Exhibit 41. These decisions were wrong, denied him due process, and were because of Sultanik's bias.

207.    Sultanik also decided that he would not entertain any evidence that Moorehead could not return to work due to a hostile and unsafe environment, because he erroneously and baselessly believed that a hostile work environment only exists in cases of sex discrimination. Exhibit 43 - Day 1, at p.137, 192-93.

### The Board Hearing Itself was Biased, Predetermined, and Unconstitutional Because the Hearing Officer Refused to Consider Evidence of Pretext or Hostile/Unsafe Work Environment

208.    On the day of the hearing on November 22, 2021, Plaintiff submitted briefing on several issues, including the bias of the board and the hearing officer, as well as Plaintiff's hostile work environment defense.

209.    The briefing noted that not only is an impartial process required by § 1129, but where a tribunal's impartiality, such as a School Board, is called into question by "prior involvement and pecuniary interest" their involvement is unconstitutional. Exhibit 42 (citing Schweiker v. McClure, 456 US 188 (1982) (emphasis added) (cited by McDaniels v. Flick, 59 F. 3d 446 (3d Cir. 1995)); see also Gibson v. Berryhill, 411 U.S. 564, 569, 93 S.Ct. 1689, 1693, 36 L.Ed.2d 488 (1973) (stating that due process requires fair and impartial hearings).

210.    The brief observed that the board was biased for seven separate reasons: (1) a lawsuit was pending against the board and its members and they had a pecuniary interest, (2) the Board was involved with suspending and attacking Plaintiff, (3) the District and Board acted as a secret arm of the FBI without informing Mr. Moorehead of this Fourth and Fifth Amendment rights against self-incrimination and search and seizure, (4) Board never corrected false statements about Moorehead out of self-interest and in fact encouraged community to spread defamatory lies about Mr. Moorehead on social media and at a Board Hearing, (5) the Board is unambiguously politically biased against Mr. Moorehead, (6) the hearing result was clearly predetermined as was the Loudermill hearing, evidenced in part by the cutting of his pay two weeks before the Loudermill notice, and (7) the Board appointed its own attorney as   the "neutral" hearing officer and refused to actually hear the matter. Exhibit 42.

211.    The memo also pointed out that the claim by Sultanik—that Moorehead had waived his right to impartiality by electing to take a board hearing instead of electing to follow the grievance process—was nonsensical; the law specifically provides for an impartial board hearing *in the event the employee does not follow the grievance process*. See § 1129.

212.    The memo went on to detail that a hostile and unsafe work environment was indeed a reason not to return to work. Federal and state employment cases are explicit that

hostile and unsafe environments prevent a return to work, as do unjust accusations by an employer against an employee. See Schafer v. Board of Pub. Educ., 903 F.2d 243, 248-49 (3d Cir. 1990); Goss v. Exxon Office Systems Co., 747 F. 2d 885 (3d Cir. 1984); Schultz v. U.S. Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987) ("On the other hand, inherent in that proposition is that the agency has reasonable grounds for threatening to take an adverse action. If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive."); Barkauskie v. Indian River School Dist., 951 F. Supp. 519 (D. Del. 1996) (stating personal attacks and defamation can create hostile work environment making return to work impossible, citing to Schafer and Goss); Indiana Univ. of Penn. v. Unempl. Comp. Bd. Of Review, 202 A.3d 195 (Pa. Cmwlth. 2019) (stating that treatment of claimant during investigation that called into question her character and integrity created hostile work environment that made return to work impossible); Porco v. Unempl. Comp. Bd. of Review, 828 A.2d 426, 428 (Pa. Cmwlth. 2003) ("In hostile work environment cases, Pennsylvania courts for half a century have found that . . . unjust accusations represent adequate justification to terminate one's employment. . . ."); Arufo v. Unempl. Comp. Bd. Of Review, 37 Pa. Commonwealth Ct. 555 (1978) (stating that an unjust "accusation [that is] ... a very real, substantial, and serious personal affront to claimant's character and integrity" creates an "untenable" employment situation).

213.    When the first part of the hearing began (there were three days of the hearing), it became apparent that Sultanik had not read the briefing and could care less about the serious issues raised.

214. On the First Day, Sultanik absurdly stated that because Mr. Moorehead did not choose to grieve this issue via the CBA, and instead chose a board hearing as he is entitled to do, that therefore he is not entitled to a fair and unbiased hearing:

| MR. MALOFIY: | You have to be fair and impartial. We're here for a fair and impartial Hearing. If Fox [Rothschild] can't be, they shouldn't be here today. |
| MR. SULTANIK: | You asked me the question of why is the Collective Bargaining Agreement relevant. You have a full and fair remedy under the Collective Bargaining Agreement with an impartial Arbitrator. |

Exhibit 43 - Day 1, at p.46. Mr. Sultanik went on to argue that because Mr. Moorehead did not elect to follow the grievance process under the CBA under Section 1133, which Mr. Sultanik said would have been impartial, that therefore Mr. Moorehead was not entitled to impartiality from the board or the hearing officer. Day 1, at p.49-50. He went on to state:

> I am dismissing the objections with respect to the Board and Hearing Officer bias and impartiality, because of the lack of addressing the election of remedies issue in the Brief. And ultimately, the Board will make a decision on that issue once the Transcript is elicited and forwarded to the School Board for review.

Day 1, at p.59. Election of remedies is completely irrelevant to whether, upon a board hearing taking place, the board hearing has to be "fair, impartial, and unbiased." Constitutionally, any post-deprivation process must be fair and unbiased, and Section 1129 also guarantees a fair and impartial board hearing. That a barred attorney presiding as a hearing officer would claim otherwise is unbelievable. See In Interest of McFall, 533 Pa. 24, 37 (Pa. 1992) ("A tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings. A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety.")

215.     Mr. Sultanik also improperly limited the evidence that Plaintiff could present regarding pretext and the impossibility of Mr. Moorehead returning to ASD because a hostile and unsafe work environment had been established.

216.     Mr. Sultanik claimed, without any basis, that only victims of sexual discrimination could establish hostile or unsafe work environment claims that would prevent an employee from returning to work. Exhibit 43 - Day 1, at p.137, 192-93.

217.     It was then revealed that Mr. Sultanik had simply refused to read Plaintiff's briefing on this point, which provided many such cases:

| | |
|---|---|
| MR. SULTANIK: | Show me one case in Pennsylvania where this kind of legal theory applies in a nonsexual harassment situation, where an employee was reinstated by management to his former position, or to a position in the School District, and where hostile work environment prohibited or caused the employee to prevail under the circumstances, in a nonsexual harassment environment. Do you have any cases to establish that? |
| MR. MALOFIY: | The fact that you sit here as a Hearing Officer and you question the Constitution and the violations and not -- |
| MR. SULTANIK: | That wasn't the question. I asked you for case authority. |
| MR. MALOFIY: | It is littered, littered in the Case Law. |
| MR. SULTANIK: | Give me one case. |
| MR. MALOFIY: | I don't have to give you one case right here. |
| MR. SULTANIK: | I'm asking you as the Hearing Officer to give me -- |
| MR. MALOFIY: | We briefed the issue. It's all there. If you failed to read it this morning, I can't help you. |

Day 1, at p.192-93.

218.     It is plain from the transcripts, communications, and Mr. Sultanik's memorandums and recommendations that he was at all times acting as solicitor for the District representing both administration and Board and protecting his clients.

219.    In no way should Sultanik or the Board itself ever been handling this matter given their obvious biases and lack of impartiality.

220.    Of note, another attorney from Fox Rothschild, Samuel Haaz, also sat with Sultanik during the hearing and purported to be a co-hearing officer. This was objected to as a clearly improper conflict of interest as the Board had never appointed Haaz as a hearing officer, and he literally represented the District (both the administration and Board) while acting as a hearing officer.

221.    Sultanik and Haaz then claimed the hearing officer was the firm "Fox Rothschild LLP." See Day 1, at p.121-24. However, the appointment by the Board specifically states that it is only Jeffrey Sultanik of Fox Rothschild LLP." This was a blatant misrepresentation of the Board's appointment.

222.    In other words, the so-called Hearing Officer misrepresented the role of his law firm, and then when called out on "making it up as he went along," he then arrogated to himself the authority to appoint a co-hearing officer from his firm.

223.    The Board knew this was a huge problem and thus on February 24, 2022 purported to appoint Haaz as a co-hearing officer. See Exhibit 53. However, this post hoc appointment could not unring the bell, nor correct the manifest conflicts of interest. This further illustrates the bias and unfair nature of this process and underscores the serial due process violations.

224.    Even worse, Plaintiff and his counsel were never notified about this "corrective" appointment of Haaz until after Plaintiff was terminated by the Board.

**Day 1 of the Board Hearing**

225.    Plaintiff's counsel placed an objection on the record to start the hearing, making it

clear that Plaintiff objected to the pretextual process taking place:

> At every stage of this process, first, his initial suspension, then the
> investigation, then the inquisition into his personal effects, at every stage
> the process has been the punishment. And at every stage when Mr.
> Moorehead has come out clean, a Boy Scout and a choir boy, that wasn't
> enough. So what happened was, there had to be more process, which is
> the punishment. . . .And at every stage we have said, and made it clear,
> that this is a sham. This process is a sham. This proceeding is a sham. And
> to have barred Attorneys in a room pretending that this is fair, neutral,
> and impartial is dripping with insincerity.

Exhibit 43, at p.11-12.

226.    Counsel pointed out that the glaring absence of the Board at the Board Hearing

was inexcusable:

> The Board's going to make decisions about credibility of witnesses, but
> they're not here to determine the credibility of those witnesses because
> they're hiding. That's why they're not here. Because if they cared about
> Mr. Moorehead, if they cared about this community, if they cared about,
> the action items in this room: safety, learning, collaboration with the
> community, account built, and learning at all levels. But that was just
> discarded. You know a mirror is a very hard to thing to face when you're
> looking back at yourself. And it's showing something that is ugly so people
> hide from it.

Exhibit 43, at p.12.

227.    Counsel went on to point out the fundamental disconnect from the

Constitution animating this pretextual attempt to terminate Plaintiff:

> Mr. Moorehead was not initially suspended because he failed to appear at
> work. He was suspended because that was the choice of the Board, that
> was the choice of the District.
>
> And that process took months and months and months. They said Mr.
> Moorehead was at the Capitol building and basically breaking in and part
> of that insurrection. He was not. He was peaceful at all times. But the
> District blasted him saying he was an insurrectionist, saying he broke in

and was part of the Capitol building protest—when he was not—and instead never corrected that record.

The District knew from the second day that he did nothing wrong. And they sat down and they put him through an inquisition . . . . And as he sits here today, now he's not here because he was at the Capitol building. He's not here because he did anything wrong. In fact, he smells like roses, he's a choir boy and a Boy Scout. . . . Every Attorney here knows there was an FBI investigation. And everyone is here dripping with insincerity putting this man at risk, his family at risk, his job at risk. . . .

[T]here's something called not the liberal states of America, there's something not called the conservative states of America, it's the United States of America. And we know that because we see that flag. And all of us underneath that flag, you, Mr. Sultanik the Hearing Officer, Mr. Taylor, you, Mr. Freund, and Mr. Pidgeon. But we all forget all our responsibilities and our duties when we want to assassinate our political opponents. When we all stand underneath the United States of America, we stand under the Constitution. And the election we made is that the School Board and the Administration follow the Constitution.

Exhibit 43, at p.13.

## Testimony on Day 1 Establishes a Hostile Work Environment

228.    At the hearing defendant Anthony Pidgeon, the Executive Director of HR, was the first to testify.

229.    Mr. Pidgeon's testimony was most notable in that he admitted that a hostile work environment existed for Mr. Moorehead, but he (as head of HR) did nothing to correct it:

MR. MALOFIY:        Now to be clear after receiving this letter and after understanding the concern that Mr. Moorehead had in regards to [accountability], correcting the  record, and his safety, what, if anything, did you do,  or what if anything did anyone do, or was there any communication about addressing that concern of Mr. Moorehead?

MR. PIDGEON:        So what our intent was when we sent the initial letter was to have a conversation with Mr. Moorehead to see where we could place him. Because the initial letter said a teaching position, *not his previous teaching position. We realized there might have been some challenges with that*. So I planned on having a conversation with

Mr. Moorehead to get his input onto where he would feel comfortable and use his Certification within the District.

Day 1, at p.189 (emphasis added). Note that Mr. Moorehead had told Mr. Pidgeon in no uncertain terms that he did not feel "comfortable" anywhere in the district. Pidgeon later continued:

| | |
|---|---|
| MR. MALOFIY: | If I may just ask you, you said there were challenges. What kind of challenges were there at Raub? You identified there were challenges at Raub, in placing him back where he was? |
| MR. PIDGEON: | I didn't say there were challenges at Raub, *I said there were challenges for Mr. Moorehead at Raub*. |
| MR. MALOFIY: | Why? |
| MR. PIDGEON: | *Because of the community outreach that we heard at the Board Meetings made some reference to Raub*. |
| . . . . | |
| MR. MALOFIY: | What, if anything, did you do to address his concerns about [accountability], safety, and making things right? |
| MR. PIDGEON: | I believe I referred this back to the Superintendent and our Solicitors. |
| . . . . | |
| MR. MALOFIY: | What did they do? Not the communications, what did they do, if anything? |
| MR. SULTANIK: | If you know? |
| THE WITNESS: | I don't know. |
| MR. MALOFIY: | *So you don't know if anyone did anything in response to his concerns; fair statement?* |
| MR. PIDGEON: | *Correct.* |

Exhibit 43 - Day 1, at p.195-200 (objections omitted) (emphases added).

230.    The testimony was disingenuous. On the one hand Pidgeon knew it would be unsafe and hostile for Moorehead to return and said he wanted to talk to Moorehead about where he would be "comfortable" working. Yet, when pressed, Pidgeon admits he never did anything to address any of Mr. Moorehead's clearly articulated concerns over 8 months. More than

anything, these admissions by the head of HR establish that the "reinstatement" was not authentic and was merely a ruse to try to limit the District's liability.

231.    Foremost, Defendants could have corrected the defamation which makes it impossible for Plaintiff to work anywhere in the District, not just Raub Middle School. The lies Defendants had spread about Mr. Moorehead created the unsafe and hostile environment—which has gone uncorrected as of the filing of this Complaint.

232.    Mr. Pidgeon also admitted he knew that Mr. Moorehead had been sent a death threat and received other harassment. Exhibit 43 - Day 1, at p.127.

233.    Yet, Mr. Pidgeon admitted that even though he privately cleared Mr. Moorehead of any involvement in the Capitol Riot on July 16, 2021, no correction or retraction of the January 7, 2021 defamatory statement about Mr. Moorehead was ever done.

234.    Further evidence of Pidgeon's culpability and hostility toward Moorehead come from his testimony regarding the CBA and its prohibition on public criticism of a teacher. Pidgeon was confronted with this prohibition and pointed to the widely publicized January 7, 2021 press release about Jason Moorehead. Pidgeon incredibly claimed that the clause did not apply because Moorehead was not identified by name—even though everyone knew the release was about Moorehead, and Pidgeon had previously admitted Moorehead could not be reinstated because of community anger against Moorehead. See Day 1, at p.208.

235.    Mr. Pidgeon was also asked about FBI involvement, and admitted that he had heard the FBI was involved after the fact. It is believed, given that Mr. Pidgeon also testified there was a "special" HR binder about Mr. Moorehead in his desk, that Pidgeon was intimately involved in the FBI action against Moorehead. See Exhibit 43 - Day 1, at 167.

236.    Pidgeon admitted that he had never kept a special HR binder on any other employee because of an FBI investigation.

### Day 2 of Testimony

237.    In Day 2 of testimony, Jennifer Ramos, who was an assistant superintendent and acting superintendent, testified. Ramos, as opposed to Pidgeon, at least had the honesty to admit that the press release was in fact about Jason Moorehead. Exhibit 49 - Day 2, at p.84-85.

238.    Ramos was questioned regarding the hostile and unsafe work environment and what was done by the administration to correct it. Ramos's answers reveal that the administration never wanted Moorehead to return and that the "reinstatement" was not sincere.

239.    Ramos was quizzed what they had done, such as correct the record, and had no response:

| | |
|---|---|
| MR. MALOFIY: | When people talk about an unsafe situation or an unsafe environment, what does the school district do, if anything? |
| MS. RAMOS: | What people? |
| MR. MALOFIY: | Anyone. They say hey, I'm concerned about my -- I'm concerned about the safety of my student. I'm concerned about the safety of a fellow teacher. I'm concerned about the safety of an administrator. What is the normal steps that are taken? |
| MS. RAMOS: | We would work with the building administration. |
| MR. MALOFIY: | How did you work with the building administration to consider Mr. Moorehead's concerns? |
| MS. RAMOS: | We didn't have the opportunity to do that. |
| MR. MALOFIY: | Why not? |
| MS. RAMOS: | Because he didn't come in to meet with our human resources department to determine his placement. |
| MR. MALOFIY: | Wait. You didn't even correct the record, did you? |
| MS. RAMOS: | Didn't correct the record. |

Exhibit 49 - Day 2, at p.89-90.

240.    Mr. Moorehead and his counsel had been writing to Defendant for almost 1 year asking them to correct the record and publicly correct the defamation that was causing Mr. Moorehead such grief. They refused to do so, and then pretended it was because he did not meet with human resources to "determine his placement." Defendants are well aware there is no place safe for him and that it is unreasonable in the extreme to expect him to come back given the hostile/unsafe environment, especially given Defendants' ongoing betrayal and defamation of Plaintiff.

241.    Ramos, however, did admit to FBI involvement starting the morning of January 7, 2021, essentially at the same Date and time the District began investigating Moorehead. Exhibit 49 - Day 2, at p.101. This involvement was hidden from Moorehead, in disregard of his constitutional rights.

### Mr. Moorehead's Pre-Textual Termination

242.    After the Board Hearing, Plaintiff submitted a post-hearing brief which explained in detail the severe substantive and procedural flaws with the entire process. Exhibit 52.

243.    Mr. Sultanik then wrote a report and recommendation, which was hidden from Plaintiff even though Plaintiff's counsel asked for it. He gave the report to the Board on July 7, 2022, and the Board voted to terminate Mr. Moorehead 9-0 on July 28, 2022.

244.    Mr. Moorehead then gave a short speech addressing how Defendants had destroyed his life and refused to correct the lie about him:

> Most of you know me better as employee number 27958, and I believe I was just terminated today, by you 9-0.
>
> And it's a shame that most of you don't even know who I am. You don't know about the 18 years I've spent giving my life to this Raub community, the amount of after school programs I've done, the amount of summer school activities I've done, the sports I've done.   My best friends are

there. I met my wife there. I've had thousands of great relationships with students and parents.

And Allentown is a tough place to work, the job loss is staggering. Since my suspension, a year and a half ago, we've lost 225 teachers and countless clerical, maintenance, secretarial, administration.

I never wanted to leave. I never wanted to leave.

I'm a parent. I have two kids in elementary school. And I understand the fears of the community, when they want to make sure the kids are in a safe place. A safe place to be, where they can be nurtured.

So I understand the outrage. But those parents have been lied to.

Yes, I went to Washington, the Capitol, D.C., to hear some speeches. But I was never a part of any violence. Period. Yet the District told the Allentown community that I was. That I was an active participant in the riots. That's a lie.

And with the secret help of the FBI, they knew that within 2 days, I was never a part of that. But it didn't matter. They never corrected their statement and told the community the truth about me.

The board then colluded with community groups to attack my character at Board meetings. Being called a racist and a white supremacist. They even ignored their own advice from their legal team, from the solicitor. I am none of those things.

I have a clean record. I have the support of every administrator that has been through, and I have been through a lot.

But I don't blame the community. They've been fed lies.

And once the district finally admitted to me privately that I had done nothing wrong, and that I could return, they refused to let the community know that I am safe, to alleviate both their fears and my fears of returning. And they still have not made a statement today that I am safe and I did nothing wrong.

I am being fired for refusing to come to a place that is unsafe, a situation you guys created. You've made it impossible for me to return. You destroyed my career, my character, my life, my marriage. I might lose my house. All because some of you did not like my political conservative views.

Shame on you. And the rest are too afraid to stand up and do what's right.

Thank you.

July 28, 2022 ASD Board Hearing, https://www.youtube.com/watch?v=DkNi9bUiUlM.

245.    No Defendant took that opportunity to affirm that Plaintiff was not at the Capitol Building or otherwise correct the record.

**The Report and Recommendation is Defective; and Demonstrates the Rampant Bias, Defective Process, and Pretext which Led to Plaintiff's Termination**

246.    On July 29, 2022, Plaintiff's counsel was sent Sultanik's report. Exhibit 54. It is apparent why it was kept from Plaintiff prior to the vote.

247.    The report is legally and factually baseless, and simply ignores the issues, evidence, and law which overwhelmingly establish that this pretextual termination was done in violation of the First and Fourteenth Amendments.

248.    **Bias and Unfairness of the Process** - The bias of both the Board and the hearing officer were major objections that Plaintiff raised and was not allowed to develop by the Hearing Officer.

249.    The recommendation completely ignores the clear and unequivocal bias of the Board and refuses to address it in any manner. The bias of the board and the refusal of Defendants to address this clear bias is a due process violation.

250.    The bias of the hearing officer was barely addressed and the discussion is nonsensical. The recommendation states of Plaintiff's objection to the hearing officer's bias only that: "Had Moorehead possessed any doubts as to the Board's ability to select an impartial Hearing Officer or Officers, Moorehead could have elected to arbitrate this matter [through the grievance process] under Section 1133 of the Collective Bargaining Agreement."

251.    This is an incredible statement on several levels for a barred attorney to make. **First**, the law and constitution guarantee "full, impartial, and unbiased consideration" when an employee chooses a board hearing instead of an administrative grievance procedure. See § 1129.

The statement by the hearing officer that an employee is not entitled to a fair, impartial, and unbiased board hearing if he chooses not to pursue the grievance process is Orwellian, frivolous, and counter to the text of the express statute and the Constitution.

252.    The hearing officer offered this justification several times before, during, and after the board hearing—as described throughout this complaint—but never provided a single citation or justification for such an absurd conclusion. This repeated assertion that an employee such as Mr. Moorehead is not entitled to a fair, impartial, and unbiased board hearing is a straightforward due process violation, and frankly outrageous misconduct designed to deliberately subvert Plaintiff's constitutional and statutory rights. The epitome of unfairness is an allegedly neutral hearing officer "ruling" that the board hearing can be biased, unfair, and partial.

253.    **Second**, the issue was never the "ability of the board to select the hearing officer," as the recommendation states. The issue is that the Board itself is biased, and also that the hearing officer is biased because he *is the board's own attorney, is not neutral, and has severe conflicts of interest*.

254.    **Third,** as noted in this complaint, Fox Rothschild attorney Samuel Haaz represented the Board and the District administration, yet sat as a hearing officer without any such appointment by the defendant Board. This is a severe conflict of interest. Over Plaintiff's objection, the hearing officer permitted Haaz to sit as a hearing officer anyway.

255.    The Board and Sultanik tried to "fix" this by appointing Haaz as a hearing officer on February 24, 2022 without even informing Plaintiff. Exhibit 53. Plaintiff only learned of this appointment when the recommendation as sent to his counsel on July 29, 2022.

256.    **The Pretextual Nature of the Termination was Ignored** - Plaintiff repeatedly objected that the given reason for his termination, "refusing to return to work," was clearly

pretextual. Plaintiff had repeatedly argued since January and February 2021 that the defamation by Defendants, and the refusal to correct that defamation, had completely broken the employment relationship and that it was also impossible for him to return because of the unsafe and hostile environment. Unwilling to admit that they had defamed and betrayed Plaintiff, Defendants instead tried to do a fake reinstatement to a nonexistent position and, when Plaintiff observed that his return was clearly impossible, then pre-textually prosecuted him for the fake reason of failing to show up to work.

257.    Despite pretext being one of the main objections to the Orwellian course of conduct by Defendants, the recommendation makes no mention or references to pretext even though pretextual terminations to cover up illegal conduct are prohibited by the law and constitution. The failure of the so-called hearing officer to address the clearly pretextual nature of Plaintiff's termination speaks volumes.

258.    **The Discussion of Hostile Work Environment is Not only Deficient, but Malicious** - Another main objection raised by Plaintiff was that Defendants had created a hostile and unsafe work environment existed and also that Defendants' defamation towards Plaintiff, public criticism, and refusal to correct the public record had broken the employment relationship and made it impossible to return.

259.    The discussion on hostile work environment in the recommendation beggars belief. Sultanik found that Mr. Moorehead had presented no evidence of a hostile work environment or of Moorehead "fearing returning to work." Sultanik also claimed that Moorehead's social media posts had caused the hostile work environment, not the District.

260.    **First**, the record was replete with evidence of a hostile work environment. The Executive Director of HR and the acting Superintendent both admitted under oath that Mr.

Moorehead could not return to his position because of "community outrage," especially the outrage expressed at the infamous February 11, 2021 board meeting. Day 1, at p.195-200. Summaries of the statements made at that board hearing were also submitted in evidence, as was a link to a video of the board hearing.

261.    Moreover, Plaintiff submitted in evidence letter after letter from counsel and Mr. Moorehead specifically identifying his fears, and administration witnesses admitted knowing about these safety concerns.

262.    To claim that there was no evidence of a hostile or unsafe environment, or no evidence that Mr. Moorehead had been unjustly accused and Defendants had destroyed the employment relationship, is absurd. The highest level administrators literally admitted that he could not return to his teaching position at the hearing.

263.    **Second**, Sultanik ruled before and during the hearing that any evidence related to hostile work environment ***was irrelevant and was not permitted***! For instance, Plaintiff wanted to subpoena the State Police regarding the threats against Mr. Moorehead and the police report he made. The subpoena was denied by Sultanik as irrelevant. Exhibit 41. During the hearing, Plaintiff repeatedly brought up and asked questions about hostile work environment, only to be told that it was irrelevant and the witness would not answer the question. Plaintiff subpoenaed board members and presented evidence to the Hearing Officer that the Board had personally arranged defamatory attacks on Plaintiff at a board hearing to call him an insurrections, terrorist, white supremacist, and biased educator. The hearing officer denied these subpoenas claiming they were irrelevant.

264.    On the one hand the hearing officer (again, who is the defendants' lawyer) rules that evidence of hostile/unsafe work environment is irrelevant. Then in his opinion

recommending termination he finds that Plaintiff should have introduced more evidence of a hostile/unsafe work environment.

265.    This is a Soviet-esque Star Chamber: predetermined, biased, and shot through with double speak and double standards.

266.    **Third**, Sultanik's conclusion that the District's defamation did not cause the hostile work environment is utterly frivolous. A few social media users ***mistakenly*** believing that Plaintiff was at the Capitol Building did not create this situation, or break the employment relationship. What created this situation was Defendants:

a.    publicly accusing Plaintiff of being at the Capitol Riot leading to a nationwide belief he rioted at the Capitol Building,

b.    refusing to correct the defamation immediately upon definitively learning it was false,

c.    publicly and falsely commenting to a newspaper that Plaintiff had engaged in un-American and subversive behavior that warrants termination,

d.    arranging for Plaintiff to be further defamed at a board hearing with the most vile accusations, and

e.    then privately admitting he was not at the Capitol Building but refusing to issue a public correction.

267.    Sultanik also ignored the testimony of the HR Director. Mr. Pidgeon testified that Mr. Moorehead could not return to his teaching position because of community outrage following the February 11, 2021 board hearing, but ignored that the evidence overwhelmingly demonstrates this outrage was whipped up by defendants Conover, Harris, and the rest of the Board.

268.    Remember, Defendants tried to reinstate Plaintiff and therefore admitted that they personally did not view any such disruption as warranting termination. However, objectively, the reason he cannot return is the broken employment relationship, and the hostile

environment which was created by Defendants and which Defendants refused to correct or address.

269.  **The Attempt to Explain Away the Defamation** - The recommendation is also notable in its attempt to spin away the unambiguous defamation of Plaintiff committed by Defendants.

270.  Sultanik spuriously claims that "The January 7, 2021 letter from the Superintendent did not name Moorehead, nor did it state that he engaged in a riot, or any unlawful activity." Recommendation, at ¶114.

271.  He also, when quoting the letter, deliberately and misleadingly alters the defamatory sentence by omitting key language. Sultanik wrote the letter said that Plaintiff was "involved in the electoral college protest…on January 6, 2021." Id. at ¶115. The full quote, with the bold portion properly added back in, is clearly defamatory:

> On January 7, 2021, the Allentown School District (ASD) was made aware of a staff member who was involved in the electoral college protest that **took place at the United States Capitol Building** on January 6, 2021.

Exhibit 1 (emphasis added).

272.  Altering the key defamatory statement to minimize the defamatory impact demonstrates that he was always acting as the Board's attorney, not as a hearing officer, and was severely biased.

273.  Other indications of bias on the part of the hearing officer were:

274.  **First**, the assistant/acting Superintendent, Jen Ramos, testified that the letter was about Moorehead and that she was never confused about that fact. Exhibit 49 - Day 2, at p.84. In fact, everyone was well aware that the press release was about Moorehead and there was no other staff member it could have been about. That Sultanik would claim differently is preposterous.

275. **Second**, as the *full* quote shows, the letter falsely states that Moorehead was involved at the "protest that took place at the United States Capitol Building." This is defamatory because the reader would no doubt be aware that the protest was actually a riot, and also because Moorehead was always over 1 mile away from the Capitol Building.

276. The local and national media was quite clear that the District was claiming that Plaintiff had rioted, and for Sultanik to pretend as if this was not the case is divorced from reality. See, e.g., "Pennsylvania teacher suspended, others lose jobs over Capitol riot," (January 8, 2021), https://www.foxnews.com/us/pennsylvania-teacher-suspended-others-lose-jobs-over-capitol-riot (emphases added).

277. **Third**, Defendants obviously accused Plaintiff of unlawful activity. It is illegal to riot, and many of the "protesters" at the Capitol Building have in fact been criminally prosecuted. Defendants also gave comment on January 8, 2021, to the Morning Call specifically stating that Plaintiff engaged in un-American and subversive behavior that warranted termination under the School Code.

278. Please note that this summary of the glaring defects with the biased Hearing Officer's recommendation is not meant to be comprehensive, only to put Defendants on notice of the basis of Plaintiff's claims to satisfy the notice pleading standard.

279. The recommendation was arbitrary, capricious, outright false, unfair, malicious, pretextual, and biased.

### Constructive Termination and Pretext

280. A resignation is considered a constructive discharge if it was "involuntarily procured" "by coercion or duress," or by misrepresentations of material fact. See Judge v.

_Shikellamy School District_, 905 F. 3d 122 (3d Cir. 2018); _Schultz v. U.S. Navy_, 810 F.2d 1133, 1136 (Fed. Cir. 1987).

281.    A constructive discharge also exists if the employee was subjected to a hostile work environment. _Schafer v. Board of Pub. Educ._, 903 F.2d 243, 248-49 (3d Cir. 1990); _Goss v. Exxon Office Systems Co._, 747 F. 2d 885 (3d Cir. 1984); _Barkauskie v. Indian River School Dist._, 951 F. Supp. 519 (D. Del. 1996).

282.    State law addressing an almost identical standard demonstrates that a hostile work environment also exists when an employee's character and integrity is unjustly called into question, he is unjustly accused, or a personal affront is made that makes the employment relationship untenable. _See_ _Indiana Univ. of Penn. v. Unempl. Comp. Bd. Of Review_, 202 A.3d 195 (Pa. Cmwlth. 2019) (stating that treatment of claimant during investigation that called into question her character and integrity created hostile work environment); _Porco v. Unempl. Comp. Bd. of Review_, 828 A.2d 426, 428 (Pa. Cmwlth. 2003) ("In hostile work environment cases, Pennsylvania courts for half a century have found that . . . unjust accusations represent adequate justification to terminate one's employment. . . ."); _Arufo v. Unempl. Comp. Bd. Of Review_, 37 Pa. Commonwealth Ct. 555 (1978) (stating that an unjust "accusation [that is] ... a very real, substantial, and serious personal affront to claimant's character and integrity" creates an "untenable" employment situation).

283.    An example of an involuntary resignation based on coercion is a resignation _**that is induced by a threat to take disciplinary action that the agency knows could not be substantiated**_. _Staats v. US Postal Service_, 99 F.3d 1120 (Fed. Cir. 1996). A threatened termination without cause or basis is "purely coercive." _Judge_, _supra_.

284.    The current state of the law creates a Catch-22 for governmental employees in Plaintiff's situation regarding whether or not to resign when a hostile work environment obviously exists and/or the employment relationship has been broken.

285.    Here, he was publicly defamed by his employer in a particularly severe manner several times over the course of two months. The defamation was never retracted and continues to ruin his life to this day.

286.    At the moment of the public defamation there was in reality no way for him to return without an immediate retraction. This is both because the severity of the unjust accusation is a betrayal of the employee and breaks the employment relationship, and because it created a hostile and unsafe environment.

287.    The fact that Defendants continued to push the defamatory lie, and even whip the community against him at the February 11, 2021 Board Hearing, simply reinforces that conclusion.

288.    Mr. Moorehead had clearly been constructively terminated on January 7, 2021, and no later than February 11, 2021. Defendants created intolerable working conditions which constitute a constructive termination, which started when they publicly attacked and defamed him.  Any teacher similarly attacked by their employer would leave or consider their employment ended. Mr. Moorehead informed Defendants that he could not return for over 1 year.

289.    However, if he actually resigned, then Defendants would have claimed that he "voluntarily resigned" while represented by counsel, waived his claims, and had no damages. He therefore could not resign without his seriously prejudicing his legal rights, but he also could not return to the District—as Defendants well knew.

290.    This was in fact explained to Defendants. Instead of correcting the defamation and finding a way to amicably part ways, Defendants doubled down and engaged in a charade. They deviously privately admitted he had not rioted at the Capitol Building and tried to "reinstate" him to a nonexistent position *without publicly correcting the defamation*, fully aware that it was impossible for Plaintiff to return or actually reinstate him. Note that defendants Pidgeon and Ramos admitted that community outrage made it impossible for Moorehead to return to Raub Middle School; the community outrage was not limited to Raub, and there was obviously no teaching position possible he could return to anywhere in the District. Defendants repeatedly suggested he instead resign, precisely because they wanted to claim he had voluntarily left.

291.    When Moorehead refused to return to an unsafe environment, and told Defendants they needed to find a way to amicably part, Defendants then maliciously terminated him on a purely pretextual ground for "not showing up to work" always completely aware that he could not return to work.

292.    The legal reality is that as of January 7, 2021, and no later than February 11, 2021, Mr. Moorehead was for all intents and purposes constructively terminated, of which Defendants themselves were well aware. Every action by Defendants that came after those dates was pure pretext by Defendants to attempt to cover up and avoid liability. This termination became official on July 28, 2022, when he was finally terminated over a year later for a pretextual reason.

**Punitive Damages are Manifestly Warranted against the Defendants**

293.    Punitive damages are appropriate against all individual Defendants.[4] Defendants, without contacting Plaintiff, publicly blasted him as a participant at the riot at the Capitol

---

[4] Punitive damages are only being alleged against the individual defendants in their individual capacities, and are not being alleged against the Board and District.

Building despite a prohibition of public criticism of teachers in the CBA. This defamation was grossly negligent, reckless, and completely outrageous.

294.    However, what came afterwards solidifies the need for punitive damages, as Defendants have acted in the most unrepentant and malicious fashion unbecoming of governmental officials.

295.    Defendants refused to correct the defamation upon learning it was false (they always should have known it was false), and afterwards then:

a.    publicly and falsely commented to a newspaper that Plaintiff had engaged in un-American and subversive behavior that warranted his termination him knowing this was not true,

b.    arranged for Plaintiff to be further defamed at a board hearing with the most vile accusations,

c.    inexcusably delayed for six months in making a decision while they tried to dig up dirt to justify discipline, including unconstitutionally searching his devices with the help of the FBI,

d.    privately admitted he was not at the Capitol Building but refusing to issue a public correction,

e.    outrageously conditioned his reinstatement on taking "cultural competency" courses which had no connection to the issues,

f.    issued a fake reinstatement letter despite knowing that he could not return to ASD,

g.    proceeded to terminate Plaintiff on a pretextual and false basis to try to cover up their egregious misconduct,

h.    the biased board and the board's own solicitor presided over and voted to terminate Plaintiff, and

i.    secretly acted as an arm of the FBI while violating his constitutional rights against self-incrimination and unreasonable search and seizures.

296.    Plaintiff's counsel repeatedly explained that each day the defamation was not corrected and he remained suspended, clouding his reputation, was evidence of malice and political persecution. Exhibit 5-25.

297.    Again, to this day Defendants have never corrected the defamation of Plaintiff and apparently believe that they are above the law.

298.    All named Defendants were involved in this process, all named Defendants had final policymaking authority, all named Defendant participated in this disciplinary process, all named Defendants supervised the disciplinary process against Plaintiff, and all named Defendants ratified the conduct toward Plaintiff. These actions by Defendants were willful, intentional, evil, malicious, and at a minimum outrageous in that they showcased a reckless and callous indifference to Plaintiff's federally protected rights. See Coleman v. Kaye, 87 F.3d 1491, 1497 (3d Cir.1996) ("[P]unitive damages may be awarded under 42 U.S.C. § 1983 `when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'").

299.    Punitive damages are needed to punish the Defendants for their conduct and deter Defendants and others from future similar behavior. Defendants have demonstrated extreme unrepentance and have weaponized their governmental positions in support of their left-wing ideology and are using their governmental power to attack their political opponents.

## Overall Damages

300.    As a result of all of the actions and omissions of the Defendants, Plaintiff has suffered the following harms:

    a.  Loss of past and future wages and benefits

    b.  Loss of career

    c.  Loss of position

    d.  Loss of reputation

  e. Loss of free speech rights

  f. Loss of due process,

  g. Severe personal and professional damage; and

  h. Severe mental and emotional damages.

*****

## Parties

301.    Plaintiff Jason Moorehead is an adult individual residing at 5360 Celia Drive, Allentown, PA 18106. He worked for the District for 18 years, was a tenured teacher, and could only disciplined and terminated for just cause in accordance with due process.

302.    Defendant School District of the City of Allentown, ("Allentown School District" or "District") is public school district in Allentown, Pennsylvania, which employed Jason Moorehead as a tenured teacher for 18 years.

303.    Defendant Board of School Directors of the School District of the City of Allentown, ("Board") is the governing body of the Allentown School District.

304.    Defendant Thomas Parker was Superintendent of the Allentown School District at all relevant times up until May 1, 2021, and is a resident of Michigan. Defendant Parker directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

305.    Defendant Anthony Pidgeon was the Executive Director of Human Resources for ASD at all relevant times up until November 2021, and is a resident of Pennsylvania. Defendant Pidgeon directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

306.    Defendant Jennifer Ramo was an Assistant Superintendent and/or Acting Superintendent during the relevant events, and is a resident of the Pennsylvania. Defendant Ramos directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

307.    Defendant Marilyn Martinez was interim superintendent from May 1, 2021 to July 22, 2021, and is a resident of the Pennsylvania. Defendant Martinez directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

308.    Defendant John D. Stanford has been superintendent from on or around November 15, 2021 to Present, and is a resident of the Pennsylvania. Defendant Stanford directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

309.    Defendant Nancy Wilt is and was the president of the ASD Board of School Directors at all relevant points, and is a resident of the Pennsylvania. Defendant Wilt directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

310.    Defendant Nicholas Miller is and was a member of the Board at all relevant times, was vice president in 2021, and is a resident of the Pennsylvania. Defendant Miller directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

311.    Defendant Sara J. Brace was a member of the Board at all relevant times until her term expired in 2021 and is a resident of Pennsylvania. Defendant Brace directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

312.    Defendant Lisa A. Conover is vice president of the Board starting in late 2021, was and is a board member at all relevant times, and is a resident of Pennsylvania. Defendant Conover

directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

313.    Defendant Phoebe D. Harris is and was a member of the Board at all relevant times and is a resident of the Pennsylvania. Defendant Harris directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

314.    Defendant Cheryl L. Johnson-Watts was a member of the Board at all relevant times until October 21, 2021, and is a resident of the Pennsylvania. Defendant Johnson-Watts directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

315.    Defendant Audrey Mathison is and was a member of the Board at all relevant times and is a resident of the Pennsylvania. Defendant Mathison directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

316.    Defendant Charles F. Thiel is and was a member of the Board at all relevant times and is a resident of the Pennsylvania. Defendant Thiel directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

317.    Defendant Linda Vega was a member of the Board at all relevant times until December 16, 2021 and is a resident of the Pennsylvania. Defendant Vegas directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

318.    Defendant Patrick Palmer is and was a member of the Board from January 16, 2022, to present day, and is a resident of the Pennsylvania. Defendant Palmer directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in his individual capacities.

319.    Defendant LaTarsha Brown is and was a member of the Board from December 16, 2021, to present day, and is a resident of the Pennsylvania. Defendant Brown directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

320.    Defendant Jennifer Lynn Ortiz is and was a member of the Board from December 16, 2021, to present day, and is a resident of the Pennsylvania. Defendant Ortiz directly participated, supervised, ratified, and acquiesced in Plaintiff's discipline and termination. Defendant is being sued in her individual capacities.

321.    The individual defendants are also being sued in their official capacity for the relief requested in the counts for a name-clearing hearing and declaring section 1122 unconstitutional.

322.    When Plaintiff refers to "defendants" or the Allentown School District or the "District" or the Board he is referring to all defendants jointly, unless otherwise specified.

323.    All Defendants are alleged to be liable for the actions and omissions of attorneys John Freund III, Brian Taylor, King Spry Herman Freund & Faul LLC, Jeffrey Sultanik, Samuel Haaz, and Fox Rothschild LLP as that conduct occurred in the scope of their agency and employment for Defendants, including as District Solicitors.

324.    All individual defendants, including the defendant board members, were aware of, approved, and ratified the public statements by the District on January 7, 2021, and suspension of

Plaintiff without <u>Loudermill</u> notice or hearing on January 7, 2021. Defendants were also aware of, approved, and ratified the public statements on January 8, 2021, and also the public statements made about Mr. Moorehead in early February 2021, and at the February 11, 2021 board hearing. Furthermore, all Defendants supervised, participated in, and ratified the course of conduct against Moorehead from January 6, 2021, to present. Despite the entirety of the targeting of Plaintiff being utterly lawless the individuals defendants participated, supervised, approved, ratified, and acquiesced to the illegal attacks on Jason Moorehead.

325.    The individual defendants are Democrats and fairly characterized as left wing politically.

326.    All individual defendants' conduct was of the sort that when considered separately, and in conjunction, was the type that imposes liability on the Allentown School District and the Board.

327.    An individual defendant's "conduct implements official policy or practice or custom under several types of circumstances, imposing liability on the entities which employ them, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." <u>Hill v. Borough of Kutztown</u>, 455 F. 3d 225, 245 (3d Cir. 2006); (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478-484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); <u>McGreevy v. Stroup</u>, 413 F.3d 359, 367 (3d Cir.2005); <u>LaVerdure v. County of Montgomery</u>, 324 F.3d 123, 125-126 (3d Cir. 2003)).

328.    All Defendants had final policymaking authority, or had been delegated final policymaking authority.

329.    Here, the actions by Defendants were not that of a rogue employee, but were entirely sanctioned by the District, Board, and chief executive at all points, from January 7, 2021 to present. This included:

    a.   Publicly criticizing, condemning, stigmatizing, defaming, retaliating, and insulting Plaintiff on January 7, 2021, and afterwards up through February 11, 2021, due to political animus for Plaintiff's political affiliations, and disagreement with the viewpoints expressed in Plaintiff's social media posts. These public and defamatory attacks on Plaintiff made it impossible for him to return to the District.

    b.   Indefinitely and illegally suspending Plaintiff on January 7, 2021, without Loudermill notice or hearing, and with intent to terminate, for an unconstitutional reason.

    c.   Claiming that Defendants were doing an investigation of Plaintiff, when no real investigation took place or was necessary.

    d.   Orchestrating defamatory attacks at the February 11, 2021 board meeting on Plaintiff.

    e.   Not providing a prompt hearing or Loudermill notice after his suspension, and delaying the process six months.

    f.   Secretly acting as an arm of the FBI without informing Plaintiff of his constitutional rights against self incrimination and unreasonable search and seizure.

    g.   Issuing a fake and pretextual Loudermill notice in April 2021.

    h.   Holding a sham "due process hearing" on May 5, 2021.

    i.   Refusing to correct the knowingly false defamatory statements made on January 7, 2021, January 8, 2021, and February 11, 2021.

    j.   Issuing a fake reinstatement notice, to a nonexistent position, when Defendants were aware that Plaintiff could not return to ASD.

    k.   Predetermining Plaintiff's termination for failing to show up to work.

    l.   Terminating Plaintiff for the pretextual reason of failing to return to work.

m. Holding a biased, unfair, and not impartial board hearing in violation of § 1129 and the US and PA constitutions, and appointing a biased hearing officer.

n. Arbitrarily and capriciously ignoring Plaintiff's objections to the given reason for the board's termination, including pretext, hostile/unsafe work environment, broken employment relationship, and bias.

o. Voting to terminate Plaintiff for a pretextual reason.

330. From January 7, 2021 onward, the District, Board and the individual defendants denied Plaintiff due process.

331. Not only were all these actions and omissions done at the direction of the District and Board's final policy makers, and ratified by the District and Board's final policy makers, but all actions and omissions that are the subject of this lawsuit were delegated by the District and Board to the District's employees.

332. Restated, all actions by the Defendants in this lawsuit were "official" actions which impose liability on the entities, and were not the actions of individual employees acting without official imprimatur. Furthermore, even if a district employee did not have "official" authority at the time of an action or omission, the District and Board ratified that conduct by continuing and participating in the persecution of Plaintiff.

333. The actions and omissions of the conduct were intentional, malicious, reckless, and/or negligent and demonstrated willful indifference and callous disregard for Plaintiff's rights.

*****

# Jurisdiction and Venue

334. Jurisdiction (and venue) over the parties in the state and federal Courts of the Commonwealth of Pennsylvania is proper. Specifically, jurisdiction as to the Defendants is

proper because they are all residents of the Commonwealth and conduct business here related to the claim at issue. Defendants transacted business in this Commonwealth and caused harm and compensable injury to Plaintiff and the assignors by acts or omissions committed in the Commonwealth of Pennsylvania that are the subject of the present complaint. All such business and harm occurred in the County of Lehigh.

335.    All federal claims are brought pursuant to and under 42 U.S.C. § 1983.

*****

## COUNT I – FIRST AMENDMENT RETALIATION FOR EXPRESSION, ASSEMBLE, AND PETITION FOR REDRESS OF GRIEVANCES

*Jason Moorehead*

*v.*

*All Defendants*

336.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

337.    "'[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred. *See Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir.2009)." Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014). The courts also hold that there are an additional two elements: (4) the employee also has to show that any

ordinary employee in Plaintiff's circumstances would be deterred from engaging in similar speech by the Defendants' retaliatory conduct, and (5) that Defendants acted under color of law. Id.

338.    Dougherty applies the Supreme Court's Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) tests, which address when a public employee's speech is protected and the considerations taken into account when dismissing an employee for speech-related reasons.

339.    Here, the protected expression in question was his attendance and political support for the January 6, 2021 Rally, and social media posts and two social media comments made by Plaintiff on January 6, 2021. The content was unrelated to Plaintiff's employment.

340.    Specifically, Plaintiff listened to speeches at the rally at the Washington Monument on January 6, 2021, and went to show support for President Trump. In doing so he engaged in political speech, engaged in political affiliation, assembled, and petitioned for redress of grievances.

341.    Early in the morning he posted a picture of himself stating "Doing my civic duty." See Exhibit 56.

342.    At 1:45 pm, before any rioting at the Capitol Building and/or before Plaintiff had any way to know that anything was occurring at the Capitol Building, he posted a picture of himself getting a hot dog near the Washington Monument. The post said "Waiting for a hot dog during (what hopefully CNN will call) a 'mostly peaceful protest' while at the Capital!" Note that this post referenced the "capital" not the "capitol" building. Id.

343.    This post was mocking CNN's infamous broadcast where a reporter and chyron characterized a leftist mob burning down Kenosha, WI as "fiery but mostly peaceful protests":



344.    Plaintiff was making a political critique of the Left in general, and CNN specifically, about how extreme violence (riots, looting, 30 plus deaths, billions in damage) was excused for 6 months by the Left because it was viewed as "for a good cause," while conservative protests did not receive such slavish praise and excusing of violence. This was and is a common critique of the left and CNN among conservatives.

345.    As the day progressed, Plaintiff made two more comments on social media posts.

346.    On a post by another user he commented "This!" to a meme which stated: "Don't worry everyone the Capitol is insured." Id.

347.    This was a reference to, and critique of, a common Left-wing excuse that it was okay for rioters to destroy businesses, buildings, and property in the Summer of 2020 because they were allegedly insured. See, e.g., Nellie Bowles, "Businesses Trying to Rebound After Unrest Face a Challenge: Not Enough Insurance," New York Times (Nov. 9, 2020), https://www.nytimes.com/2020/11/09/business/small-business-insurance-unrest-kenosha.html ("It's a prominent refrain these days from activists in the aftermath of arson and looting — businesses have insurance. Buildings can be repaired. Broken glass is a small price to pay in a

movement for justice."). Plaintiff was pointing out that the Left and liberals were hypocrites and only worried about violence when it did not serve their political ends.

348.    He also commented on a meme posted by another user. The meme was a picture of the absurd Viking man who sat on the dais in the Capitol Building, and captioned "Protestor challenges Pelosi for speaker of house via trial by combat circa 2021," a joke reference to the popular TV show Game of Thrones. Plaintiff's comment was "Wrong on so many levels, but hilarious none the less." See Exhibit 56.

349.    His attendance at the Rally, and speech in his social media posts, is squarely protected and any retaliation by Defendants because of this speech, affiliation, assembly, or petitioning for redress of grievances violated the First Amendment.

350.    Furthermore, any retaliation against Plaintiff because of the perceived viewpoint of his opinions, his peacefully attending the Rally, or Defendants' perception of his opinions concerning election fraud is unconstitutional.

351.    It must be noted, Defendants were unambiguous on January 7 and 8, 2021, that he had been suspended indefinitely with intent to terminate for taking part in the protest/riot at the Capitol Building and thereby participating in un-American and subversive actions and doctrines, which is a ground for termination under section 1122.  Only afterwards, once they realized that they had defamed him, did they start trying to absurdly justify his suspension as because of these social media posts and comments.

**First Element - Whether the Speech is Protected**

352.    The first element to be satisfied is whether the employee's speech is protected by the First Amendment.

353.     "As the Supreme Court has reiterated time and time again, 'free and unhindered debate on matters of public importance' is 'the core value of the Free Speech Clause of the First Amendment.' *Pickering,* 391 U.S. at 573, 88 S.Ct. 1731. Accordingly, 'public employees do not surrender all their First Amendment rights by reason of their employment.' *Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951. At the same time, the Supreme Court also aptly recognizes the government's countervailing interest—as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace. *See id.* at 418-19, 126 S.Ct. 1951. Thus, '[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.' *Id.* at 419, 126 S.Ct. 1951." Dougherty, 772 F.3d at 993-94.

354.     Under Garcetti there is a three-step inquiry to determine if speech is protected by the First Amendment: (1) the employee must speak as a citizen not an employee, (2) the speech must involve a matter of public concern, and (3) the government must lack an 'adequate justification' for treating the employee different than the general public based on its needs as an employer under Pickering. See Dougherty, 772 F.3d at 987. Under Pickering the courts "'balance... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' 391 U.S. at 568, 88 S.Ct. 1731. The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer. *McGreevy,* 413 F.3d at 365." Dougherty, 772 F.3d at 991.

355.     There is no question under Garcetti and Pickering that Plaintiff's speech is protected.

356.    **First**, Plaintiff's private attendance at the Rally in support of President Trump is protected speech and affiliation unconnected to his job, and was also protected assembly and petition to his government for redress of grievances. Defendants' statements, comments, and actions—especially leading up to and at the February 11, 2021 board hearing—demonstrate that they consider Plaintiff's support for President Trump a reason to discipline Plaintiff and publicly defame and stigmatize him as an "insurrectionist," "terrorist," "white supremacist," "racist," "bigot," "biased educator," and a host of other vile accusations.

357.    The social media posts and comments in question by Plaintiff were as a private citizen and were unconnected to his employment. They were not made in the course of his official duties and had nothing to do with his job.

358.    **Second**, the expression in question was in fact on matters of public concern— hotly contested social and political issues—unrelated to his job and which he directed to the public as a private citizen. Plaintiff's political speech on non-school issues in a non-school setting is afforded the broadest protection, as a private citizen.

359.    **Third**, the governmental Defendants have the heaviest burden—a burden they cannot meet—showing that Plaintiff's speech could cause disruption and that they should treat him differently than a member of the general public. The <u>Pickering</u> test arose to address where the speech in question has some relation to the employee's job which could cause disruption in the workplace.

360.    Here, the fact that Defendants purported to reinstate him on July 16, 2021, demonstrates that any potential disruption was not actionable or sufficient to suspend or terminate him even in Defendants' own eyes.

361.    Note that any disruption was the result of social media users erroneously and baselessly believing Plaintiff was at the Capitol Building, not the content of the posts—erroneous beliefs which Defendants' defamation extraordinarily amplified and reinforced.

362.    Indeed, Plaintiff attended a political rally and made several short political comments on social media. Nothing about this speech was extraordinary, warranted his suspension with no notice or hearing, warranted any discipline, warranted Defendants viciously attacking and defaming him, and certainly did not justify six months of suspension.

363.    As noted throughout this complaint, the citation to his social media speech was done post hoc as a pretext after Defendants realized their publicly stated reason for Plaintiff's suspension was false.

364.    This type of *post hoc* rationalization is not only viewed as pretext by the courts, but also as evidence of viewpoint discrimination. American Freedom Defense v. Washington Metro., 901 F. 3d 356, 366 (D.C. Cir. 2018). Pretextual and insincere excuses to justify viewpoint discrimination are to be disregarded. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

365.    Controversial political speech is exactly the type of speech meant to be protected by the First Amendment. McIntyre v. Ohio Elections Comm'n, 514 U. S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression"). Indeed, the Supreme Court has consistently and repeatedly held that "the First Amendment protects 'even hurtful speech on public issues to ensure that we do no stifle public debate.'" Mahanoy Area School District, Petitioner V. B. L, 141 S. Ct. 2038 (2021) (quoting Synder v. Phelps, 562 (U.S. 443, 461 (2011)).

366.    The Mahanoy court held that schools have:

> an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection.

Id.

367.    Where a public employer claims the right to punish speech because of "disruption," the Supreme Court holds that "When it comes to political or religious speech that occurs outside school or a school program or activity, the school *will have a heavy burden to justify intervention*." Id. (emphasis added).

368.    Note that the Mahanoy court was analyzing out of school speech *by a student*— where schools have a hypothetical interest in regulating student speech because of the school's parental role—but still noted that schools have a heavy burden to justify intervention.  It further observed that if the student in question had been "an adult, the First Amendment would provide strong protection." Id. at 2047.

369.    Consider that a school's attempt to justify intervention over an *adult* employee's out of school political speech, where the school does not serve in a parental role, is a practically impossible burden for Defendants to satisfy.

370.    Allowing Defendants to claim that it can terminate employees for controversial speech would give carte blanche to the Heckler's Veto and render the First Amendment a dead letter.

371.    Thus, Plaintiff's speech is squarely protected by the First Amendment.

**Second and Third Elements - Defendants Retaliated against Plaintiff Because of His Protected Speech**

372.    The second element is that Plaintiff must show that his protected speech was a "substantial or motivating" factor in retaliatory actions taken against him by Defendants, and that there was not some other legitimate reason for the discipline. In other words, he needs to show causation. Mirabella v. Villard, 853 F. 3d 641, 651-52 (3d Cir. 2017).

373.    In a retaliation claim, the courts ask "whether the Government is punishing the plaintiffs for exercising their rights." Id. (quoting Miller v. Mitchell, 598 F.3d 139, 148 n.9 (3d Cir. 2010)).

374.    Where the retaliation includes "official speech" by the Defendants the Courts ask whether there was "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." Id.

375.    Here, there is no question that the governmental employer punished Plaintiff for exercising free speech rights on political and social issues they disagreed with, and that Defendants' official speech included overt threats, coercion, stigmatization, defamation, and intimidation.

376.    It is not proper or constitutional to discipline and otherwise retaliate against a teacher engaged in out of school political expression because of "emotion" and "controversy." See Exhibit 1.

377.    Plaintiff was kept suspended for six months by Defendants because of the content of his speech, who he assembled with, and the content of his grievances. He was also publicly attacked and defamed by Defendants on January 7, January 8, in early February, and at the Board Meeting on February 11, 2021.

378.    Plaintiff was expressly told by Defendants that the adverse actions by Defendants against him were because of the content of his social media posts, which are protected speech. Given that Defendants actually did suspend Plaintiff without warning or notice for his social media posts, and then later terminated him, this violated the First Amendment.

379.    Defendants also essentially admitted to First Amendment violations when they told the Morning Call on January 8, 2021, that Moorehead was being disciplined and investigated for participating in un-American and subversive doctrines. This is straightforward content-based discrimination which is illegal.

380.    There are many specific examples of retaliatory actions which are independently and jointly actionable:

    a.    Publicly criticizing, condemning, stigmatizing, defaming, retaliating, and insulting Plaintiff on January 7, 2021, and afterwards up through February 11, 2021, due to political animus for Plaintiff's political affiliations, and disagreement with the viewpoints expressed in Plaintiff's social media posts. These public and defamatory attacks on Plaintiff made it impossible for him to return to the District.

    b.    Indefinitely and illegally suspending Plaintiff on January 7, 2021, without Loudermill notice or hearing, and with intent to terminate, for an unconstitutional reason.

    c.    Claiming that Defendants were doing an investigation of Plaintiff, when no real investigation took place or was necessary.

    d.    Orchestrating defamatory attacks at the February 11, 2021 board meeting on Plaintiff.

    e.    Not providing a prompt hearing or Loudermill notice after his suspension, and delaying the process six months.

    f.    Secretly acting as an arm of the FBI without informing Plaintiff of his constitutional rights against self-incrimination and unreasonable search and seizure.

    g.    Issuing a fake and pretextual Loudermill notice in April 2021.

    h.    Holding a sham "due process hearing" on May 5, 2021.

    i.   Refusing to correct the knowingly false defamatory statements made on January 7, 2021, January 8, 2021, and February 11, 2021.

    j.   Issuing a fake reinstatement notice, to a nonexistent position, when Defendants were aware that Plaintiff could not return to ASD.

    k.   Predetermining Plaintiff's termination for failing to show up to work.

    l.   Terminating Plaintiff for the pretextual reason of failing to return to work.

    m.   Holding a biased, unfair, and not impartial board hearing in violation of § 1129 and the US and PA constitutions, and appointing a biased hearing officer.

    n.   Arbitrarily and capriciously ignoring Plaintiff's objections to the given reason for the board's termination, including pretext, hostile/unsafe work environment, broken employment relationship, and bias.

    o.   Voting to terminate Plaintiff for a pretextual reason.

381.    All the retaliatory actions were intended as punishment, and were taken by Defendants because they desired to punish Plaintiff for expressing viewpoints they disagreed with.

382.    Note that even a baseless suspension with pay for a retaliatory reason is itself legally actionable on its own and by itself.  See Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011).

383.    Smith illustrates the egregious nature of Defendants' actions. Smith held that a suspension without notice or a hearing is an extreme measure only appropriate in cases where public safety is directly implicated—a reason which is not even remotely applicable in this case. Id.

384.    Here, Plaintiff was suspended without notice or hearing on January 7, 2021, and simultaneously viciously attacked by the District Superintendent and the District's official social media accounts. It is clear from the public and private statements made by the District that this was done with the intent to terminate Plaintiff.

385.    The court hold that it is actionable where "exercise of [plaintiff's] First Amendment right of speech [used] to initiate a baseless prosecution." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 797 (3d Cir. 2000).

386.    As noted, the third element of a First Amendment retaliation claim states that when Plaintiff has shown viewpoint retaliation played a part in his termination, then the burden is on the Defendants to show that there was some other legitimate reason for their actions. See Connick v. Myers, 461 U.S. 138, at 152-53 (1983) (explaining that the greater the extent to which the speech involves matters of public concern, the stronger the employer's showing must be). If Defendants can establish a prima facie legitimate reason for disciplining Plaintiff and that an illegal reason was not a substantial motivating factor, then the burden shifts back to Plaintiff to show pretext.

387.    The evidence, and Defendants' own admissions, overwhelmingly prove that Defendants' actions were retaliation for Plaintiff's political opinions and attendance at the Rally, the content of Plaintiff's social media posts, as well as the uncorrected defamatory accusation he had rioted at the Capitol Building, and that they cannot meet any such burden.

388.    To the extent defendants try to claim that Plaintiff was terminated for not showing up to work, that is pure pretext as explained throughout this complaint.

389.    Defendants also cannot meet their burden because it is glaringly evident that, at a minimum, political malice and viewpoint discrimination was a significant reason and/or a substantial motivating factor for the discipline. Mirabella, 853 F. 3d at 651-52. Where the illegitimate reason is still a substantial motivating factor, Defendants lose the case without any burden shifting.

**Fourth and Fifth Element - That an Ordinary Employee would Be Deterred from Engaging in Protected Speech and that Defendants Acted Under Color of Law**

390.    The fourth element is that an ordinary employee would be deterred by the retaliatory actions of the employer, and the fifth is that the Defendants acted under color of law.

391.    Here, there is no question, given the public condemnation of Plaintiff by Defendants, his illegal six month suspension, and the pretextual discipline against him that an ordinary employee in Plaintiff's position will be deterred from privately posting political expression on social media, attending conservative rallies, petitioning the government, assembling, or otherwise expressing any conservative opinion. Indeed, the overt defamatory attacks made on Plaintiff to damage his job and career would deter any reasonable employee from engaging in speech to avoid public vivisection and loss of employment.

392.    Defendants at all points acted under color of law and held themselves out as having the authority and right to take the retaliatory actions against Plaintiff.

393.    As noted, Plaintiff was in fact suspended for six months and then terminated because of the content of his speech and his political opinions. This is also the reason the defamation has never been corrected.

**The Individual Defendants are Not Entitled to Qualified Immunity**

394.    When governmental officials are sued in their individual capacities under § 1983, they can only claim qualified immunity if the Constitutional rights at issue were not clearly established.

395.    Here, the right at issue is Plaintiff's right to freedom of speech in non-school settings on issues not related to the school district.

396.    Courts generally look to the Supreme Court and Courts of Appeal as to whether a right is clearly established; however, other authority may be cited as well.

397.    Here, the right of public employees to speak freely about political issues in non-school settings on matters of public concern is near absolute.

398.    Indeed, the right to free speech in the First Amendment which protects Plaintiff's social media posts is well known.

399.    The case law is likewise clear that public employees have a right to speak out on issues of public concern, outside of work, as explained by the Third Circuit in Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 993-94 (3d Cir. 2014):

   a.    "Since at least 1967, "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 103 S.Ct. 1684 ; see also Rankin, 483 U.S. at 383, 107 S.Ct. 2891 (finding the same principle "clearly established"). In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the Pickering and Garcetti rules of decision and our subsequent case law. See, e.g., Pickering, 391 U.S. at 566, 88 S.Ct. 1731 (protecting speech by teacher to local newspaper criticizing the school board and the superintendent's allocation of school funds); O'Donnell, 875 F.2d at 1060, 1061–63 (protecting speech by chief of police to local television station that accused township supervisors of various corrupt practices, legal improprieties, and abuses of their positions); Watters,

55 F.3d at 897–98 (protecting speech by program manager to local newspaper criticizing departmental program the employee oversaw where dispute existed over cause of disruption); <u>Baldassare</u>, 250 F.3d at 199–200 (protecting investigation into alleged wrongdoing of law enforcement officers where there was no "alter ego" relationship). Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity."

400.   This case is far more clear-cut than even those cases cited by <u>Dougherty</u>. The cases cited by <u>Dougherty</u> all involved speech that at least related in some way to the governmental employer's operations.

401.   Here, the speech in dispute was attendance of political rallies and private political expression on Plaintiff's private social media completely unrelated to his employment.

402.   All individual Defendants knew and should have known that Plaintiff's speech was protected as evidenced by longstanding Third Circuit and Supreme Court precedent on First Amendment Retaliation and Fourteenth Amendment Due Process protections. They therefore have no qualified immunity.

403.   As a result of the First Amendment retaliation against Plaintiff, he has suffered grievous harm, including to his career, economically, mentally, emotionally, reputationally, personally, and professionally.

404.   Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed, at a minimum, a reckless indifference to his rights.

*****

## COUNT II – FIRST AMENDMENT RETALIATION FOR POLITICAL AFFILIATION

*Jason Moorehead*

*v.*

*All Defendants*

405.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

406.    To make out a claim of discrimination based on political association, a public employee must allege (1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision. Goodman v. Pennsylvania Turnpike Com'n, 293 F.3d 655, 663-664 (3d Cir. 2002). Plaintiff must also show that an ordinary employee in his circumstances would be deterred from holding and expressing his political affiliations, and that Defendants acted under color of law.

407.    Here, Plaintiff's position as a tenured teacher does not require a political affiliation.

408.    Plaintiff's private social media contained and expressed statements of political affiliation and support for Republicans, conservatives, and President Donald J. Trump.

409.    As described throughout this complaint, Defendants took adverse action against Plaintiff both because he affiliated with President Trump, and also because of the perceived political affiliations his social media posts conveyed.

410.    In general, it has to be taken into account that Defendants' personnel and culture are overwhelmingly liberal and Democratic.

411.    The tenor of the public debate, including inside Defendant school district, is now that any person perceived as having unacceptable opinions can and should be canceled for being offensive, as Defendants stated publicly and privately to Plaintiff.

412.    Defendants have extreme animus for Plaintiff based on his perceived political affiliations, especially as indicated by the refusal to retract the defamation on January 7 and 8, 2021, and the outrageous collusion to destroy Plaintiff's reputation and career on February 11, 2021.

413.    As a direct and proximate result of Plaintiff's perceived political associations, political positions, and perceived opposition to Defendants' favored political support groups, he was suspended by Defendants, and then later terminated for these reasons.

414.    Plaintiff's political affiliations were a substantial motivating factor in Defendants disciplining him. There were no legitimate reasons for his discipline, as described *supra*, and any such reasons were also pretextual.

415.    Note that as with the free speech retaliation claim, the rights at issue are longstanding and indisputable. The right to engage in Political Activities and associate and identify as one likes in nonschool settings is expressly recognized. As a result, no defendant being sued on an individual basis can invoke qualified immunity.

416.    As a result of the First Amendment retaliation against Plaintiff, he has suffered grievous harm, including to his career, economically, mentally, emotionally, reputationally, professionally, and personally.

417.    Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed, at a minimum, a reckless indifference to his rights.

**COUNT III – PENNSYLVANIA SCHOOL CODE SECTION 1122 VIOLATES THE US AND PENNSYLVANIA CONSTITUTIONS' GUARANTEE TO FREEDOM OF EXPRESSION, ASSOCIATION, ASSEMBLY, PETITION FOR REDRESS OF GRIEVANCES, AND DUE PROCESS**

*Jason Moorehead*

*v.*

*All Defendants*

418.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

419.    This is both a facial challenge to the constitutionality of Pennsylvania School Code § 1122 as drafted, and as applied to Plaintiff in this case. He has standing to challenge this law as a tenured professional teacher for 18 years who was subject to the law, as a certified teaching professional who is subject to the law, and because he alleges he was unconstitutionally suspended, defamed, and ultimately terminated for allegedly violating section 1122, defamation which remains uncorrected to this day.

420.    The First Amendment to the Federal Constitution guarantees that freedom of speech, affiliation, assembly, and petition for redress of grievances shall not be infringed.

421.    Article I, Section 7 to the Pennsylvania Constitution, and Section 20, guarantee freedom of expression and related rights including freedom of assembly and the right to petition the government for redress of grievances.

422.    The 14th Amendment to the Federal Constitution guarantees due process of law, as does Article I, Section 1 of the Pennsylvania Constitution.

423.    Section 1122 lists the grounds on which a teacher in Pennsylvania can be terminated:

> Section 1122.  Causes for Termination of Contract.--(a)  The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be  . . . advocation of or participating in un-American or subversive doctrines . . . .

24 Pa. CS § 11-1122.

424.    Defendants made a public press release on January 7, 2021, falsely informing the public that a teacher—reasonably identifiable as, and in fact identified as, Jason Moorehead—was being suspended indefinitely for participating in the January 6, 2021 Capitol Building riot.

425.    On January 8, 2021, Defendants' solicitor in fact told the Allentown Morning Call that Plaintiff was suspended for participating in un-American and subversive doctrines, one of the grounds for termination of a tenured teacher enumerated in section 1122.

426.    The story contains comments from Defendants, stating:

> "The district is taking the matter seriously and has started the process of investigating the extent of the teacher's involvement [in the Capitol Building riot], district solicitor John E. Freund III said."

Exhibit 4.

427.    Defendants, by and through the District Solicitor, were also quoted as saying:

> "The district has to balance the employee's right to free speech and association, against teachers' duty not to participate in or advocate un-American or subversive doctrines" he said, referencing the Pennsylvania public school code.

Id.

428.    The solicitor reiterated that this was the basis for Plaintiff's discipline to Plaintiff's counsel on February 8, 2021. Exhibit 15.

429.    Since Brandenburg v. Ohio, Tinker v. Des Moines, Texas v. Johnson, and U.S. v. Eichman, laws purporting to prohibit un-American or subversive speech or conduct have been struck down as unconstitutionally prohibiting speech and related constitutional rights.

430.    Such laws are only valid to the extent they are narrowly tailored to forbid unprotected speech, namely imminent incitement to illegal activity, and are otherwise void for overbreadth and vagueness.

431.    Section 1122 is not narrowly tailored and in fact broadly prohibits vast swaths of permissible speech and activities protected by the US and Pennsylvania constitutions.

432.    Plaintiff also did not engaged in imminent incitement to illegal activity.

433.    Defendants, acting under color of state law, have disciplined, suspended, constructively terminated, terminated, defamed, violated his First Amendment rights, and violated his 14th Amendment Rights in reliance on Section 1122.

434.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable injury which cannot be fully compensated by an award of money damages.

435.    Plaintiff asks that section 1122 of the Pennsylvania School Code be declared in violation of the First and Fourteenth Amendments to the US Constitution, and Article 1 sections 7 and 20 of the Pennsylvania Constitution, for (1) permitting viewpoint discrimination, and (2) for being overbroad and vague.

436.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a preliminary and permanent injunction invalidating and restraining enforcement of section 1122. Additionally, Plaintiff is entitled to damages in an amount to be determined by the Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

*****

# COUNT IV – PROCEDURAL DUE PROCESS

*Jason Moorehead*

*v.*

*All Defendants*

437.     Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

438.     A plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). An essential principle of due process is that a "deprivation of life, liberty, or property `be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950)). Due process fundamentally requires that the individual be given an opportunity for a hearing before he is deprived of his property interest. Id.

439.     Plaintiff Jason Moorehead alleges due process violations of three distinct types:

    a.   Property based pre-deprivation and post-deprivation due process claims, because he was suspended without notice depriving him of his right to continue in his employment, then terminated for a pretextual reason in an unfair and biased board hearing;

    b.   A stigma plus liberty due process claim;

    c.   A reputation plus liberty due process claim

440.     Note that certain government actions are barred regardless of the fairness of the procedures used to implement them, which serves to prevent governmental power from being "used for purposes of oppression," Murray's Lessee [474 U.S. 327, 332]   v. Hoboken Land &

Improvement Co., 18 How. 272, 277 (1856) (discussing Due Process Clause of Fifth Amendment).

441.    Plaintiff wants to be absolutely clear that Defendants had no basis upon which to take and/or continue any adverse action against him, and that even if he had been given the fairest of process it could not legitimatize what Defendants have done.

442.    However, the conduct of Defendants during this so-called process was so deficient that it must be subject to court review and sanction as a matter of public record.

**a.    Due Process Claim for Property Interest in Continued Employment**

443.    Plaintiff had a clear and indisputable property interest in his continuing employment.

444.    "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir.2005) (citing Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Whether a person has a legitimate entitlement to — and hence a property interest in — his government job is a question answered by state law. Id.

445.    Under Pennsylvania law, Plaintiff was a 18-year employee of Defendants, as well as a tenured teacher. The Pennsylvania School Code provides that teachers can only be dismissed for just cause, see § 1122, ***and*** the Collective Bargaining Agreement further states that tenured teachers such as Plaintiff ***cannot be disciplined without just cause***.

446.    He therefore has a property interest in continuing employment and not being disciplined without just cause in accordance with the Due Process protections in the U.S Constitution as expressed by the U.S. Supreme Court.

447.    In addition, where a suspension is done with intent to terminate, it is viewed as a de facto termination and constitutes a deprivation to which due process protections attach. See Gniotek v. City of Philadelphia, 808 F. 2d 241, 243-44 (3d Cir. 1986) (stating that suspensions with intent to terminate are *de facto* dismissals and due process protections attach). The same is alleged where the defendant employer has in effect worked a constructive termination upon the employee by creating a hostile and unsafe work environment and/or acted in such a manner as to break the employment relationship beyond repair.

448.    Only a strong government interest can justify the pre-hearing deprivation of a property right, usually related to public safety concerns, which are not implicated by this case. Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008); Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011) (stating that where employee can only be dismissed for cause, the plaintiff has a property interest in not being suspended without cause).

449.    Even if immediate suspension is warranted, then prompt post-suspension process critical to protect employee rights.

450.    The following actions were taken by the district without notice or an opportunity to be heard, in violation of the School Code and due process protections under the Fourteenth Amendment.

  a.  Pre-Deprivation Denial of Due Process - Indefinite suspension with pay without Loudermill notice or hearing on January 7, 2021, with intent to terminate

    i.  Jason Moorehead was indefinitely suspended on January 7, 2021, without notice despite no prior history of discipline. This suspension was done with intent to terminate.

    ii.  The District Solicitor told the Morning Call on January 8, 2021, that Plaintiff had been suspended because he had participated in un-American and subversive doctrines. This was an explicit and express reference to Section 1122 of the School Code, the section identifying

the exclusive reasons to terminate a teacher, which lists one ground for termination as "advocation of or participating in un-American or subversive doctrines."[5]

iii. The suspension was also obviously done with intent to terminate because the District put out public statements telling the public Plaintiff had rioted at the Capitol Building and was therefore being suspended indefinitely.

iv. Note that Defendants' defamatory statements were so damaging, and such a betrayal of Moorehead, that the employment relationship was irrevocably broken when they were made, all without him being afforded any due process.

v. Plaintiff had a property right is not being suspended without Loudermill Notice and opportunity to respond, a property right in not being suspended with intent to terminate without a Loudermill Notice or an opportunity to respond, and property right in not being constructively terminated as of January 7, 2021. See Gniotek, 808 F. 2d at 243-44 (stating that suspensions with intent to terminate are *de facto* dismissals and due process protections attach). The defamatory public statements about Plaintiff's suspension also caused due process protections to attach, and required pre-statement notice and an opportunity to respond. Indeed, the CBA prohibited any public criticism of Moorehead by Defendants, and state tort law prohibits defamation.

vi. Only a strong government interest in very limited circumstances can justify the pre-hearing deprivation of a property right, usually related to public safety concerns, which are not implicated by this case. Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008); Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011) (stating that where employee can only be dismissed for cause, the plaintiff has a property interest in not being suspended without cause).

vii. Here, there was no valid justification to immediate suspend Plaintiff without any notice or hearing, especially with intent to terminate, nor to constructively terminate Plaintiff by egregiously defaming him. Note that the entire point of Loudermill—to give the employee notice and the opportunity response—is to prevent exactly what happened in this case before any irrevocable action takes place.

viii. Where a pre-deprivation due process violation has occurred for failure

---

[5] This given reason is unconstitutional, as alleged and explained in Cause of Action III. The solicitor reiterated that this was the basis of the suspension on January 8, 2021, and February 8, 2021.

to provide Loudermill notice and hearing, a complete constitutional violation has already occurred, regardless of the adequacy of any post-deprivation process. <u>Alvin v. Suzuki</u>, 227 F.3d 107, 120 (3d Cir. 2000) (where no due process pre-deprivation "a complete constitutional violation has (allegedly) already occurred; if the Constitution requires pre-termination procedures, the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures.").

ix. Here, Plaintiff's pre-deprivation/suspension due process rights were violated when he was suspended with intent to terminate, publicly defamed around the nation with a factually false and unconstitutional reason for his suspension, and constructively terminated all without Loudermill notice or opportunity to be heard.

b. The Pretextual <u>Loudermill</u> Notice and Sham Reinstatement Violated Due Process

i. Following Plaintiff's immediate suspension with intent to terminate for a false and unconstitutional reason "advocation and participation in un-American and subversive doctrines" (which they publicly blasted to the entire nation), it was impossible for Plaintiff to return, the employment relationship was broken, and he had been constructively terminated.

ii. However, even hypothetically setting aside the constructive termination on January 7, 2021, what happened after the suspension egregiously violated due process.

iii. Having ascertained that the reason for suspension was false, the correct course of action would have been to publicly correct the record and unsuspend Plaintiff. Defendants did not do this. Instead Defendants waited three months, before issuing a fake Loudermill notice in April 2021.

iv. This so-called <u>Loudermill</u> notice said nothing about participating in "un-American and subversive" doctrines, the initial given reason for the suspension, and instead pretended as if the suspension was about social media posts and the manner in which he had requested off from work. Note that Defendants' outrageous attacks on Plaintiff at the February 11, 2021, board meeting made it quite clear the real basis for their persecution.

v. Indeed, Plaintiff's counsel was told by the Solicitor that if the devices he turned over were clean (and they were), the defamation would be corrected and he would be cleared. Plaintiff's counsel objected in a letter to the Solicitor.

vi.   Setting aside that the posts are protected speech, nothing about the posts nor how he requested off work could have justified what was at that time a 3-month suspension. Essentially, Defendants were changing the rules and bases for the suspension as they went, trying to avoid admitting they did anything wrong without correcting the defamation.

vii.  A hearing was held on May 5, 2021, which Plaintiff objected to and refused to participate in.

viii. On July 16, 2021, Defendants privately admitted in a letter to Plaintiff that he had not attacked the Capitol Building. They knew or should have known this fact since January 7, 2021. Despite this admission, they did not publicly correct the record.

ix.   Defendants' letter then stated that Plaintiff would be reinstated. However, this reinstatement was conditioned on Plaintiff taking classes on African American and Latino cultural competency. This requirement was utterly baseless and completely unconnected to anything that had occurred. The letter also disclosed that he would not be returning to Raub Middle School, and that the District had not identified any new position for him.

x.    This was a sham reinstatement for three reasons: (1) Defendants knew that the employment relationship was broken and a hostile/unsafe work environment existed which prevented reinstatement (especially given that the defamation was uncorrected), (2) the baseless requirement that he take cultural competency classes was a nonstarter Defendants knew he would not agree to,[6] and (3) no position was even identified for reinstatement, because it would be impossible to reinstate him to a teaching position.

xi.   The simple fact of the matter is that after January 7-8, 2021, and the vitriol directed at Plaintiff on February 11, 2021, Defendants never had any intention of bringing Plaintiff back. Everything done after those points was designed by Defendant to avoid admitting any wrongdoing, avoid correcting the defamation, and making sure Moorehead did not return.

xii.  The use of a fake Loudermill process and reinstatement violated Plaintiff's due process rights.

---

[6] This requirement shows the political motivations behind the discipline against Plaintiff.

c.  The Extreme Delay in the Illegal Process by Defendants up to July 16, 2021, Violated Plaintiff's Due Process Rights

i.  Even if Defendants' immediate suspension with intent to terminate Plaintiff for a false and unconstitutional reason (which they publicly blasted to the entire nation) was somehow proper they had a duty to promptly provide him due process thereafter. See Barry, 443 U.S. at 66 (stating that if immediate suspension is justified "the [employee's] interest in a speedy resolution of the controversy becomes paramount, it seems to us."). Having suspended him it was incumbent upon them to promptly provide him due process, including a Loudermill notice and hearing.

ii.  Defendants should have known that Moorehead was not at the Capitol Building on January 7, 2021, and definitively knew he was not there on January 8, 2021.

iii.  Despite that knowledge, they failed to correct their defamatory public statements, in fact doubled down and amplified these defamatory statements at the February 11, 2021 board hearing, and failed at any point to notify the public that the given reason for his suspension with intent to terminate—"participation in un-American and subversive doctrines"—was false.

iv.  At various points Defendants claimed that an investigation was ongoing. This was a false and pretextual excuse to delay and figure out how to cover up their failures and terminate Moorehead. The District knew what happened almost immediately and had no evidence to suggest otherwise. Consider also that if an investigation was actually needed, then why did Defendants not wait for an investigation before defaming Moorehead on January 7 and 8 and February 11, 2021? Why were the results of this so-called investigation never communicated to the public?

v.  Defendants did not even provide a Loudermill notice until April 9, 2021, three months after he was suspended. This was an outrageous and prejudicial delay. The public believed he had rioted at the Capitol Building because of Defendants' statements and his suspension; by delaying, Defendants made that harm permanent (indeed, it has never been corrected).

vi.  As noted elsewhere, the notice itself cited pretextual reasons for his discipline, such as the social media posts, and was entirely objectionable and violative of due process. Defendants were attempting to pretend away the reason they had suspended him indefinitely in the first place: rioting at the Capitol Building. They knew this basis was false and were thus required to unsuspend him. Instead, they tried to

find other reasons to justify his suspension.

vii. Ultimately, Defendants purported to reinstate Moorehead on July 16, 2021, privately admitted he had not rioted at the Capitol Building. As noted elsewhere, this was a fake reinstatement. However, it should be noted that even Defendants now admitted that Moorehead had done nothing that warranted his suspension or termination.

viii. Note that prompt due process is most important where irrevocable harm will occur if quick action is not taken. Barry, *supra*. For instance, where a suspension will be served by the time the Loudermill process is finished is an instance where prompt process is necessary. Necessarily, where Defendants have promulgated a false reason for an employee's suspension, which is destroying his reputation and career, a prompt process is also necessary.

ix. Defendants claimed to be doing an investigation, but in reality they were attempting to delay to figure out how to get rid of Plaintiff without having to publicly admit they defamed him.

x. All told, until Defendants' fake reinstatement, it was over six months of unjust and baseless suspension.

d. Plaintiff's Termination for "Willful Neglect of Duties" was a Pretextual Sham which Violated His Due Process Rights

i. After Plaintiff objected to the sham reinstatement, and made it clear that there was no way he could return to ASD, Defendants moved to terminate him.

ii. Without warning or notice, while he was suspended, they cut his pay on September 1, 2021, effectively suspending him without pay. This alone was a pre-termination due process violation as he was required to be given Loudermill notice and hearing prior to being suspended without pay. Alvin, 227 F.3d at 120. This also shows that the termination decision was predetermined.

iii. A Loudermill notice was eventually sent on September 9, 2021, which claimed that he had failed to show up to work after allegedly being reinstated. As noted, reinstatement was impossible given the uncorrected defamation, and the requirement that Plaintiff take diversity classes as if he had done something wrong was unacceptable.

iv. At a September 22, 2021 Loudermill hearing Plaintiff objected to the predetermined nature of the charge, the obviously pretextual nature of the charge, the failure to correct the defamation, and the impossibility of Plaintiff's return given the broken employment relationship and hostile/unsafe work environment. Plaintiff had been telling Defendant

for over 1 year that it was impossible for him to return.

v. Plaintiff was thereafter notified that he was being terminated allegedly for failing to show up to work.

vi. Under the School Code Plaintiff could choose to do an administrative grievance arbitration, or choose a board hearing that is fair, unbiased, and impartial. See Pa. School Code§ 1129; 1133. As reinstatement is impossible, pursuing a grievance arbitration the termination makes no sense. Therefore, a board hearing took place.

vii. This post-termination process was pretextual, predetermined, and a sham for the reasons described in this complaint.

viii. The Board and its members are also biased and not impartial, including because of their participation in and ratification of the discipline against him, their participation and ratification of the retaliation against him, because they had been sued, and because of their political animus for Plaintiff. This is in violation of not only the School Code, but also the US constitution.

ix. The hearing officer(s) is also biased and not impartial because although he styled himself a "hearing officer," he is in reality the Board's own attorney and has professional and financial duties to protect their interests.

x. The board hearing process was unfair for the reasons enumerated in this complaint, including that relevant defenses and arguments were disregarded and relevant evidence and witnesses were prohibited.

xi. It was also a violation of due process for the board to refuse to attend the board hearing, and instead have their own attorney sit in place of the board and issue the recommendation to terminate which they voted to accept 9-0.

451.   Everything about Defendants' actions evidence an improper retaliatory intent and lack of due process.

**b. Plaintiff has a Stigma-Plus Due Process Claim against Defendants**

452.   A "stigma plus" claim occurs when the government imposes "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities." O'Donnell, 148 F.3d at 1140 (quoting Roth, 408 U.S. at 573). The theory is, in

essence, that some government action might impose such a harsh taint that it interferes with an individual's "right to follow a chosen trade or profession." <u>Cafeteria Restaurant Workers Union, Local 473 v. McElroy</u>, 367 U.S. 886, 895-96 (1961).

453.    This implicates Plaintiff's liberty interest, as opposed to his property interests.

454.    The government must impose so great a constraint on an individual's future employment opportunities that it "involve[s] a tangible change in status" — that is, it must amount to "an adjudication of status under law." <u>Kartseva v. Department of State</u>, 37 F.3d 1524, 1527 (D.C. Cir. 1994); <u>O'Donnell</u>, 148 F.3d at 1141 ("[A] plaintiff who . . . seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm must show that the harm occurred in conjunction with, or flowed from, some tangible change in status."). The action must have a "broad effect of largely precluding [her] from pursuing her chosen career." <u>Kartseva</u>, 37 F.3d at 1528; <u>GE Co. v. Jackson</u>, 610 F.3d 110, 121 (D.C. Cir. 2010).

455.    The stigma does not have to result from official speech, but can also result from the overall nature of the conduct by Defendants.

456.    Here, Plaintiff was egregiously defamed on January 7, 2021, when Defendants told the public that a teacher—he was readily identifiable as the teacher, and was in fact so identified—had been involved in the Capitol Building protest and riot. This was defamatory as Plaintiff had never been within 1 mile of the Capitol Building and also had no taken part in any protest or riot at the Capitol Building. This press release effectively destroyed Plaintiffs' reputation and career.

457.    Defendants have rotely claimed since this all started that the fact the press release does not name him means they escape liability, and have resolutely ignored that he was

reasonably identifiable. However, in a memo submitted before the second day of testimony on December 6, 2021, the District inadvertently admitted that Moorehead was reasonably identifiable. Specifically, the District wrote that:

> Of significant note, this posting by former Superintendent Thomas Parker did not identify Mr. Moorehead. Publication of his presence was the result solely of Mr. Moorehead's online actions and activities [on Jan. 6, 2021].

Exhibit 46; accord Exhibits 34, 39. Restated, Defendants have conclusively admitted that they knew that Moorehead was identifiable by the public as the subject of the defamatory press release.

458.    Indeed, comments on the District's social media accounts on and after January 7, 2021, made it clear that Defendants knew that the public knew the identity of the teacher referenced in the press release. See, e.g., Exhibit 55.

459.    On January 8, 2021, despite knowing that the accusation was untrue and that Moorehead was in fact being identified as the subject of the press release, Defendants gave comment to the Allentown Morning Call further falsely stating and/or implying that Moorehead had been at the Capitol Building and involved in the violence there, and defamatorily identified the basis of his suspension with intent to terminate as advocating and participating in un-American and subversive doctrines, which could only be understood by the reader as stating that Moorehead was present at and had participated in the Capitol Building riot.

460.    Defendants' defamation *per se* of Plaintiff spread all over the nation and destroyed his reputation.

461.    Defendants knew or should have known from January 7 onward, and did know from January 8 onward, that Plaintiff was not at the Capitol Building, had not rioted, and was at all times peaceful and law abiding.

462.     Defendants, out of political animus for Plaintiff, refuse to this day to correct the defamatory comments made on January 7 and 8, 2021—even though they privately admitted to Jason Moorehead on July 16, 2021, in writing that they knew there was no truth to the accusations.

463.     The defamation on January 7 and 8, 2021 was enough by itself to stigmatize and destroy Plaintiff's reputation and career, especially as it was published nationally and has never been corrected. However, Defendants also stigmatized and further harmed Plaintiff when the Defendant Board, especially defendants Conover and Harris, colluded with community groups to have individuals attack plaintiff before and during a February 11, 2021, board hearing with knowingly false lies including that Plaintiff was an insurrectionist, rioter, guilty of treason, terrorist, white supremacist, bigot, racist, and biased educator. Defendants' own attorney specifically cautioned the Defendant Board and its members that this was egregious defamation of Plaintiff, apparently unaware that the defamation had been organized by the Board and its members out of political animus.

464.     Remember, the Board knew Moorehead was not at the Capitol Building, but nevertheless arranged, colluded, permitted, and ratified this further stigmatization and defamation of Plaintiff. None of this defamation has been corrected.

465.     If Plaintiff applies for a job anywhere, he will have to disclose what happened, and it is also easily found on the internet. He is a pariah.

466.     As a result of the concerted and deliberate effort by Defendants to stigmatize and discipline Plaintiff, Defendants have severely harmed and stigmatized Plaintiff and made it largely impossible to pursue Plaintiff's chosen career.

467.     Plaintiff has suffered severe damage as a result, including loss of employment, loss

of wages, future employment, mental and emotional anguish, and loss of reputation.

468.    Plaintiff also requests that his name and reputation be cleared by Defendants.

469.    Plaintiff's repeatedly demanded from January 2021 to present that his name be cleared and specifically requested a name clearing hearing.

**c.    Plaintiff has a Reputation-Plus Due Process Claim Against Defendants**

470.    As opposed to a stigma plus claim, a reputation plus claim requires that Plaintiff show that he was defamed and be accompanied by some other plus, defined as a tangible loss. See Good v. City of Sunbury, 352 F. App'x 688, 691-92 (3d Cir. 2009) (listing "tangible" losses found to be valid by the courts as including "deprivation of the liberty to pursue a calling or occupation; an injury to plaintiff's reputation while in the exercise of her constitutional right to free speech; and a constructive discharge and consequent damage to plaintiff's ability to earn a living[]" (internal quotation marks and citations omitted)."); Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 797 (3d Cir. 2000) (stating that a "plus" exists where "exercise of [plaintiff's] First Amendment right of speech [used] to initiate [and continue] a baseless prosecution.").

471.    The inquiry focuses on whether Plaintiff's reputation was injured "while in the exercise of a constitutional right." Merkle, 211 F.3d at 797.

472.    This claim is only actionable when the employer has disseminated the reasons for the termination and the dissemination is defamatory.

473.    **Defamation** - Here, as noted Plaintiff was defamed by Defendants on January 7, 8, and February 11, 2021, in a very public manner. None of these defamatory statements have been publicly corrected or retracted, even though Defendants have privately admitted they are false.

474.    **The Plus** -The pluses in this case include, both independently and jointly,

        a.  He was repeatedly defamed by Defendants in retaliation for peacefully

exercising his First Amendment Rights to Assemble, Petition his Government, associate and affiliate, and engage in free speech.

b. Violation of Constitutional rights guaranteeing free expression, assembly, and affiliation.

c. He was maliciously prosecuted—both in the initiation and continuation without probable cause—for engaging in constitutionally protected conduct and speech, and Defendants then pretextually continued the prosecution even when they knew the given bases for the discipline were false

d. the deprivation of ability to pursue his occupation due to egregious and public nature of the defamation,

e. his constructive termination,

f. violation of the CBA prohibition on public criticism of teachers,

g. violation of his property interest in not being suspended without notice,

h. the failure to afford him pre-deprivation and post-deprivation due process,

i. reassigning him to a nonexistent position and baselessly requiring him to take diversity classes;

j. failing to correct the hostile and unsafe work environment,

k. pretextually terminating him for a false reason, and,

l. violation of school policies guaranteeing free expression and affiliation.

475. The outrageous defamation of Plaintiff by Defendants for political reasons, which has never been corrected, is exactly the type of conduct that creates a quintessential Reputation Plus claim.

476. Plaintiff has suffered severe damage as a result as a result of the property, stigma, and reputation plus due process violations, including loss of employment, loss of wages, future employment, mental and emotional anguish, loss of reputation, and personal damages.

477. Plaintiff also requests that his name and reputation be cleared by the district.

478. In today's day and age, accusations of the sort that Defendants have made against Plaintiff are a stake through the heart of a public educator's career. Defendants knew this, and

acted deliberately to punish and retaliate against Plaintiff because of his politics.

479.    As a result he has suffered severe economic, mental, emotional, and reputational damages.

480.    The individual Defendants cannot claim qualified privilege because the rights at issue were clearly established at all relevant times.

481.    Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed at a minimum reckless indifference to his rights.

*****

## COUNT V – VIOLATIONS OF FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION FOR COERCED STATEMENTS AND UNREASONABLE SEARCH AND SEIZURE ON BEHALF OF THE FBI

*Jason Moorehead*

*v.*

*All Defendants*

482.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

483.    Plaintiff was interviewed by Defendants on January 8, 2021, and asked a series of questions. Plaintiff was unaware that although Defendants were asking the questions, they were doing so on behalf of the Federal Bureau of Investigation and that he was a suspect and/or person of interest and/or a target in a criminal FBI investigation.

484.    Later, in April 2021, Plaintiff's counsel turned over Plaintiff's electronic devices to be searched under protest after being assured there was no criminal aspect to the request. In fact, the FBI or its contractor conducted the search and/or the contents of the device were given

to the FBI.

485.     The evidence establishing the FBI was heavily involved in the school district's investigation is alleged *supra* in the body of the complaint, at paragraph 169. It includes that (1) executive HR director Anthony Pidgeon was told by Ramos, Freund, and/or Taylor that the FBI was involved in investigating Plaintiff, (2) assistant superintendent Jennifer Ramos testified that the FBI contacted the school district the morning of January 7, 2021, and that this started the investigation into Moorehead with Freund liaising with the FBI, (3) that questions were asked in the January 8, 2021 interview that likely came from the FBI, (4) that the FBI admitted in a FOIA denial that there are Moorehead investigation records and communications with Defendants, and (5) that technology used to produce the forensic report of Mr. Moorehead's devices was done by Magnet Forensics software, an FBI contractor which supplies the FBI was software and assistance.

486.     Given the admissions from the FBI and high-level district officials—as well as the other evidence identified and reasonable inferences taken from that evidence—Plaintiff considers it beyond peradventure that the FBI started and was intimately involved in the Moorehead investigation, and that this was hidden from him by Defendants in violation of his rights. Plaintiff notes that whether or not Count V proceeds, the FBI's involvement and the fact that it was hidden from Plaintiff—even to the point where affirmative statements were made by Defendants that there was no criminal investigation to lull Plaintiff into a false sense of security—is relevant to the other claims.

**Fifth and Fourteenth Amendment Violations - Right Against Self-Incrimination**

487.     Preceding the January 8, 2021 interview, Plaintiff was never informed by his employer or the FBI of his constitutional right against self-incrimination, an egregious violation

of the Fifth Amendment, nor that he should have criminal defense counsel present even though he was effectively being interviewed as a suspect by the FBI.

488.    Plaintiff was instead given a misleading Garrity notice immediately before the interview which did not disclose he actually was already under criminal investigation by the FBI, and that he was being interviewed as part of an FBI investigation. Exhibit 3. Note that this meeting was coercive, with Plaintiff being told he had to attend and answers the questions or be fired.

489.    Garrity protects Plaintiff, a public employee, under the Fifth and Fourteenth Amendment against coerced statements.

490.    This Garrity notice stated, *inter alia*, that the questions asked would be "Directed and narrowly related to the performance of your official duties." It also stated that statements made during the interview "cannot be used against you in any subsequent criminal proceeding, nor can the fruits of any of your statements be used against you in any subsequent criminal proceeding." See Exhibit 3. It also explained that if he refused to answer questions relating to "performance of official duties, you will be subject to dismissal." Id.

491.    Plaintiff thought he was sitting down with his school employer to clear up his whereabouts on January 6, 2021; he did not know his employer was secretly working with the FBI to target him.

492.    Under Garrity, the questions should have been narrowly tailored to his official job duties; instead, they were far ranging, overbroad, and in hindsight part of a criminal inquiry, in violation of Garrity and the Fifth Amendment. He was asked if he knew certain individuals (he later found out participated in the riot), how he got to DC, who he traveled with, who he met there, how he met people, political social media groups he visited, and his activities on January 6,

2021.

493.    Plaintiff was tricked by Defendants into sitting for a criminal interrogation.

494.    Under Garrity, none of these statements can be used in any criminal investigation or prosecution and law enforcement is not supposed to be involved; to have law enforcement conduct, participate, influence, or direct a Garrity interview is outrageous. The entire point of Garrity is to prevent the commingling of an administrative workplace investigation and a criminal investigation. It is unconscionable that Garrity was invoked by Defendants to lull Plaintiff into a false sense of security, without disclosing that this was a criminal law enforcement interrogation part of an FBI investigation that predated the Garrity notice and interview.

495.    Note that it is not as if Defendants did the Garrity meeting, then later shared the protected statements with law enforcement, which would still be prohibited; they actually secretly acted on behalf of the FBI in the Garrity interview, a truly outrageous constitutional violation. It is alleged that all steps by Defendants in their investigation of Mr. Moorehead were on behalf of law enforcement, namely the FBI.

496.    Plaintiff adamantly maintained at the meeting that he was at all times over 1 mile away from the Capitol Building. Plaintiff was, however, forced to answer questions far outside the proper scope of Garrity.

497.    The Fifth Amendment violations against Plaintiff are manifest. Plaintiff's coerced statements in the January 8, 2021 meeting are being used to continue a baseless FBI investigation into Mr. Moorehead in violation of Garrity and his Fifth and Fourteenth Amendment Rights.

498.    Troublingly, the FBI has indicated there is still an active investigation or prospective case which prevents it from releasing its records; the statements coerced from Plaintiff under false pretenses at the illegal interview on January 8, 2021, violate the Constitution.

<u>See</u> Exhibits 57-60.[7]

499.    Mr. Moorehead was also forced to answer questions by the District that were not narrowly tailored to his job, and which were later used as justification by the District to seize and search his devices, e.g., the District claimed it needed to see if he had visited extremist websites. This given reason was pretextual and also violated the First Amendment, as it is clearly viewpoint based discrimination.

500.    As explained below, the statements he gave in response to the improper coercive questioning led to the improper search and seizure, resulted in the District baselessly requiring cultural competency classes, resulted in his formal firing, and resulted in an ongoing criminal investigation.

**Claim for Unreasonable Search and Seizure in Violation of Fourth Amendment**

501.    There was never any evidence whatsoever that Mr. Moorehead was at the Capitol Building, and there was no reasonable suspicion or probable cause to suspect that he had been at the Capitol Building or committed any crimes or workplace violations.

502.    In mid-to-late January 2021, Defendants requested his work laptop, Chrome book, and an iPad. The claimed purpose was that this was necessary to the school's investigation into his whereabouts. Again, the school had no reason to believe that Plaintiff was anywhere near the Capitol Building. Defendants also later claimed they needed to know if he was visiting "extremist websites."

503.    All these devices were exclusively used by Plaintiff. Plaintiff had a reasonable expectation of privacy to these devices and their contents, and that the devices would not be

---

[7] Note that this claim is being alleged in part to preserve Plaintiff's rights given that the FBI has admitted there is a pending FBI investigation the outcome of which Plaintiff does not know.

arbitrarily and capriciously searched, especially because Defendants disagreed with his political opinions and affiliations.

504.    Plaintiff always asserted his right to privacy in the devices, and that the request for the devices was entirely pretextual:

> As to the laptop, you did not request it for 14 days after the event occurred and 12 days after his inquisition. To ask for it so late in the game indicates that the District has nothing else on Mr. Moorehead and that investigation does not have any real basis and are attempting to justify this ex post facto

Exhibit 10 - January 28, 2021 Letter.

505.    On February 3, 2021, Plaintiff's counsel stated by email and phone:

> Pursuant to our phone conversation, please confirm in writing that there are no criminal allegations, concerns, or 5th amendment rights at play or at issue regarding Jason Moorehead.
>
> . . . .
>
> Lastly, it should be understood that by providing these devices, Mr. Moorehead is in no way waiving any rights. He has done nothing wrong and there was no basis to suspend him, put out a press release about him, "suspend" or "reassign" him, or take any other action against him whatsoever. By requiring Mr. Moorehead to turn over his devices, the District is further abusing and violating his constitutional rights on a fishing expedition to manufacture a pretextual basis to dismiss him. There was no probable cause, reasonable suspicion, or any legally cognizable indicia that could allow you to prosecute him or search his work devices.
>
> That said, because the District has threatened to punish Mr. Moorehead further if the devices are not turned over, we are doing so under protest and without waiver of any rights.

Exhibit 13 - February 3, 2021 Email.

506.    Also on February 3, 2021, the solicitor confirmed that "The district has no interest in pursuing criminal prosecution." Exhibit 13. The solicitor did not mention that Plaintiff was under active FBI investigation and that the devices and their contents were being examined

by the FBI and/or given to the FBI.

507.    On February 8, 2021, Freund additionally claimed that the District wanted to know if Plaintiff was visiting "extremist" websites. There was no basis for this given reason, which violates the First Amendment.

508.    After additional back and forth making it clear that Plaintiff was only acting under protest and that there was no basis for this request, the devices were turned over.

509.    In other words, Defendants seized Plaintiff's devices while secretly acting as an arm of the FBI, without disclosing that they were being searched by law enforcement to try to incriminate Plaintiff in an active FBI investigation. Defendants also seized the devices for political reasons to attempt to pretextually justify the defamation and discipline against Mr. Moorehead.

510.    Defendants even falsely assured Plaintiff's counsel there was no criminal aspect to turning over these devices, so that Plaintiff's counsel would turn over the devices. This was improper and the devices were turned over under false pretenses.

511.    A § 1983 claim under the Fourth Amendment is proper against a governmental actor where: (1) there was a seizure, (2) the seizure was performed by a governmental actor, (3) the seizure must have been unreasonable, and (4) there must have been an injury as a result of the seizure.

512.    **First**, Plaintiff's three work devices were in fact seized.

513.    **Second**, the seizure was done by Defendants who are governmental actors and who were also secretly working on behalf of the FBI as part of a criminal investigation into Jason Moorehead.

514.    **Third**, the seizure was manifestly unreasonable. See O'Connor v. Ortega, 480

U.S. 709, (1987) (holding that governmental employee had reasonable expectation of privacy in his work office); Graham v Connor, 490 US 386, 396 (1989) (stating that reasonableness involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."). There was no grounds whatsoever to believe that Jason Moorehead was at the Capitol Building on January 6, 2021, or had done anything illegal or untoward, or even that he had violated any school policy that would require a search of his devices.

515.    Furthermore, when Plaintiff's counsel specifically asked for assurances there was no criminal aspect to this request, he was misled both in that he was told there was no criminal aspect and also that he was told a private company would be searching the devices or reviewing their contents. He was not told about FBI involvement. As noted, the devices were inveigled from him under false pretenses.

## Damages

516.    Plaintiff was directly and proximately caused harm by the unreasonable search and seizure in violation of his Fourth Amendment rights, and also the violation of Garrity and his Fifth and Fourteenth Amendment rights which led to the search and seizure.

517.    At the January 8, 2021 meeting secretly directed by the FBI, the questions were not narrowly tailored to Mr. Moorehead's job in violation of Garrity. Instead, on a fishing expedition, he was interrogated as to his political associations and groups he was familiar with. These statements were coerced under threat of termination and violated the First Amendment, as well as the Fifth Amendment. Plaintiff is not sophisticated in matters of law and criminal procedures; he was tricked by Defendants.

518.    Following this coercive meeting, having no evidence that Moorehead did

anything wrong whatsoever, the District demanded that Moorehead produce all his devices for inspection; his counsel was assured there was no criminal investigation. In fact, Mr. Moorehead was secretly under criminal investigation by the FBI, and the FBI or its contractor searched the devices and/or was given the device contents for examination. This search was also fishing expedition meant to attempt to find some basis to justify the continuing suspension and defamatory statements made about Moorehead, which were politically motivated, and also violated the First Amendment.

519.    As a result of the improper interview and unreasonable search and seizure of his devices, he suffered harm. **First**, Defendants claimed in the July 16, 2021 reinstatement letter, that he had improperly visited political and other websites on his work devices. Defendants used this to justify his six month suspension and also to impose humiliating conditions on Mr. Moorehead's return such as forcing him to take cultural competency classes. His refusal to do so led to his formal termination by Defendants. It was also meant to be a disciplinary strike/demerit against Plaintiff. These harms are a direct result of the improper interview and the illegal search.

520.    Note that his use of devices was not the real reason he was suspended or kept suspended, and the search of the devices was occasioned by unconstitutional viewpoint discrimination and political malice on the part of Defendants, as a pretext to attempt to provide cover for the unconstitutional suspension with intent to terminate and refusal to correct the defamation. No other left wing employees have been subjected to such seizures for attending left wing rallies, such as BLM.

521.    They also intruded upon his seclusion out of animus for his political opinions, associations, and assembly in violation of the First Amendment.

522.    **Second**, the FBI has stated that there is a pending investigation into Jason

Moorehead, but refuses to disclose the basis. On information and belief, it is alleged that any such continuing investigation is the product of the unreasonable and baseless search and seizure of Plaintiff's devices, and also the violation of Plaintiff's rights under <u>Garrity</u> and the Fifth and Fourteenth Amendments. It is beyond outrageous that Defendants told Plaintiff under <u>Garrity</u> that nothing in the interview was connected to a criminal investigation, when Defendants were already working with the FBI—and then continued to do so for at least the next six months.

523.    The illegal interview, and the search and seizure of his devices, has also caused Mr. Moorehead extreme embarrassment, humiliation, and mental distress. Mr. Moorehead is being made to feel like he is a criminal, and subject to putative criminal prosecution for unknown reasons for years, because he holds conservative political opinions which Defendants oppose.

524.    Plaintiff requests punitive damages against all Defendants for their outrageous subversion and violation of his Fourth, Fifth, and Fourteenth Amendment Constitutional rights, which was done at a minimum with reckless indifference to Plaintiff's rights.

*****

# COUNT VI – DECLARATORY AND EQUITABLE RELIEF - NAME-CLEARING HEARING

*Jason Moorehead*

*v.*

*All Defendants*

525.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

526.    Plaintiff hereby demands a name-clearing hearing.

527.    Plaintiff has repeatedly demanded a name clearing since January 2021.

*****

# RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such other equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

    a.    A name-clearing hearing and public retraction and correction of defamatory statements;

    b.    Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including loss of earnings, loss of career, reputational/stigma damage, personally, and professional;

    c.    Mental and emotional pain and suffering;

    d.    Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior, reckless and callous indifference to Plaintiff's rights, and evil motives;

    e.    Exemplary damages to set an example for others;

    f.    Attorneys' fees, costs, and court costs under § 1988;

    g.    interest;

    h.    prejudgment interest;

    i.    Delay damages;

    j.    Other equitable relief that may be necessary to enforce Plaintiff's rights; and,

    k.    Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

\*\*\*\*\*

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC


*/s/ AJ Fluehr*

Alfred J. Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/ May 9, 2023*

# Jury Trial Demand

Plaintiff hereby demands a 12-person jury trial.

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ AJ Fluehr*

Alfred J. Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/ May 9, 2023*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Amended Complaint was filed with the Electronic Filing System on the following in accordance with the Rules of Civil Procedure:

John Freund, Esquire
Brian Taylor, Esquire
King, Spry, Herman, Freund & Faul LLC
One West Broad Street, Suite 700
Bethlehem, PA 18018
T: (610) 332-0390
F: (610) 332-0314
E: jef@kingspry.com
*Attorneys for Defendants*

\*\*\*\*\*

*Respectfully submitted,*
Francis Alexander, LLC
*/s/ AJ Fluehr*
Alfred J. Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/ May 9, 2023*