**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| JASON MOOREHEAD, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:22-cv-03959-JMG |
| | : | |
| SCHOOL DISTRICT OF THE CITY OF | : | |
| ALLENTOWN, *et al.*, | : | |
| Defendants. | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                               **July 9 , 2024**

## I.      OVERVIEW

Plaintiff Jason Moorehead, formerly a middle school teacher for Defendant School District of the City of Allentown ("ASD"), alleges numerous § 1983 claims against his ex-employer, its school board, and, in their personal capacities, its school board members and some administrators. Mr. Moorehead claims he was suspended, defamed, constructively terminated, and officially terminated by Defendants because of his political support for Donald Trump in violation of his First and Fourteenth Amendment rights.[1] In their motion for summary judgment, Defendants argue that no such violations occurred; that Plaintiff's troubles are his own doing and may be traced back to his decisions to promote his attendance at former President Trump's "Stop the Steal" rally on January 6, 2021 and to make light of the ensuing Capitol riot[2] on social media.

Before the Court is Defendants' motion for summary judgment. For the reasons that follow,

---

[1] Although not addressed in the current briefing, Plaintiff also alleges violations of his Fourth, Fifth, and Fourteenth Amendment rights stemming from Defendants' alleged cooperation with the FBI.

[2] Because Defendants and Plaintiff each refer to the events at the Capitol Building on January 6, 2021 as a "riot," the Court adopts that language for the purposes of summary judgment. *See e.g.*, Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. at 4, 8 ("Defs.' Br.") (ECF No. 65-1); Pl.'s Resp. in Opp'n to Def.s' [sic] Mot. for Summ. J. ("Pl.'s Resp.") at 5, 7 (ECF No. 70).

Defendants' motion is granted in part and denied in part. The Court grants summary judgment in favor of Defendants on Plaintiff's due process claims, but otherwise denies the motion. The Court also *sua sponte* dismisses, but does not strike, Count V because it is a prayer for relief, not an independent cause of action.

## II.   BACKGROUND

### A.   Relevant Facts

#### 1.   *Plaintiff attends the "Stop the Steal" rally in Washington, D.C.*

ASD hired Plaintiff Jason Moorehead as a teacher in 2003, where he worked continuously for almost nineteen years until his termination in 2022. *See* Pl.'s Statement of Disputed Facts Responding in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp. SUMF") at ¶ 1 (ECF No. 70-2). No complaints were ever filed against Mr. Moorehead during his nineteen years of service. Pl.'s Statement of Add'l Facts in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s SUMF") at ¶ 1 (ECF No. 70-1). On this record, Mr. Moorehead's political views appear to have been immaterial to his experience as a teacher and his interaction with students. That changed on January 6, 2020.

Mr. Moorehead describes himself as a conservative republican who supported Donald Trump's bid for reelection in 2020. *Id.* at ¶ 4. His support for President Trump led him to Washington, D.C. on January 6 to attend the "Stop the Steal" rally. Despite the violence that occurred that day at the Capitol Building, Mr. Moorehead's experience was relatively uneventful. He listened to President Trump's and others' speeches, ate a hot dog near the Washington Monument, and then boarded a bus back to Allentown. *Id.* at ¶ 12.[3] Plaintiff was in fact never within one mile of the Capitol Building. *Id.* at ¶ 13. Mr. Moorehead issued four Facebook posts on his personal account that day—which was restricted to only his Facebook connections—related to the "Stop the Steal" rally and the Capitol

---

[3] Defendants do not rebut Plaintiff's claim that he was never present at the Capitol Building on January 6, 2021.

Building riot (pictured below). Defense App. at DA2200–04 (ECF No. 67); Pl.'s Resp. SUMF at ¶ 4. The record indicates that his social media activity was how the ASD community initially learned of his presence in Washington, D.C. on January 6th. Pl.'s Resp. SUMF at ¶ 4. News of his attendance in our capital to support Donald Trump spread quickly, and with great controversy, among the ASD community. Community members identified Plaintiff as an ASD teacher in their social media posts to ASD Facebook pages. *Id.* at ¶ 5.









Defense App. at DA2200–04.

The next morning, Defendant Executive Director of Human Resources Anthony Pidgeon called Plaintiff and advised him not to come into work "because of yesterday." Pl.'s SUMF at ¶ 24. In an email to Mr. Moorehead later that day, Defendant Pidgeon shared his "serious concerns about [Plaintiff's] involvement in the civil unrest that occurred at the United States Capitol Building" and that they were investigating his involvement. *Id.* at ¶ 25. Later that same day, on January 7, Defendant Superintendent Thomas Parker issued the following statement (the "Statement") before any ASD official asked Plaintiff whether he had been at the Capitol Building:

> Dear Allentown Families, Staff & Community:
>
> On January 7, 2021, the Allentown School District (ASD) was made aware of a staff member who was involved in the electoral college protest that took place at the United States Capitol Building on January 6, 2021.
>
> We understand that many members of our community are upset by the image. At the same time, the district has an obligation to respect the First Amendment rights of our staff and students.
>
> Because of the emotion and controversy stirred by the events of the January 6, 2021,

the teacher has been temporarily relieved of his teaching duties until the School District can complete a formal investigation of his involvement.

*Id.* at ¶ 30. The opening sentence of the Statement is incorrect. Mr. Moorehead was not "involved in the electoral college protest that took place at the United States Capitol Building." Although Plaintiff was not explicitly identified by the Statement, the community readily recognized the teacher as Mr. Moorehead. Pl.'s Resp. SUMF at ¶ 15. The Statement was posted to the ASD website, the main ASD Facebook and Instagram accounts, the social media accounts for the particular school Plaintiff taught at, and emailed to all ASD staff members. Pl.'s SUMF at ¶ 33. That same day, ASD suspended Plaintiff with pay pending an investigation into the matter. Pl.'s Resp. SUMF at ¶ 12.

On January 26, 2021, Plaintiff requested Defendants issue a correction because he was being harassed and receiving death threats. Pl.'s SUMF ¶ 89. His home address had been publicized and he was receiving voicemails threatening him and his family. *Id.* at ¶¶ 86, 88. Several of these voicemails accused him of lying about his presence at the Capitol riot. *Id.* at ¶ 86.

### 2.    *School board meetings in January and February of 2021*

The community's interest in this matter did not lessen in the following months. Many concerned citizens voiced their opinions at school board meetings held in January and February of 2021. At the January 28th hearing, several community members stepped forward to voice their support for Plaintiff and encouraged the school board to correct the Statement. Pl.'s Supp'l App. at SA1020 (ECF No.s 70-3, 4). No community members spoke against Plaintiff at this board meeting. *Id.*

The board meetings on February 11th and 25th proceeded in a starkly different manner. The public comment portion of those meetings were predominantly critical of Mr. Moorehead, with members of the public repeatedly connecting him to the Capitol riot. *Id.* at SA1033, 95. During the February 11th board meeting, the District Solicitor stepped in several times to remind attendees that not all the facts were established and at one point voiced his concern for defamation. *Id.* at SA1045–

6

46, 55.

The facts surrounding the February 11th and 25th board meetings are important details in this case, but they are only addressed in Plaintiff's responsive briefing. According to Plaintiff, Defendant Conover, a member of the school board, coordinated with Promise Neighborhoods—a non-profit community organizing group on whose board Defendant Conover allegedly served at the time—to attack and defame Plaintiff during the February school board meetings. Discovery has revealed text messages indicating that Defendant Conover encouraged Promise Neighborhoods to draft and circulate a petition that strongly implied Plaintiff was a white supremacist. Pl.'s SUMF at ¶¶ 98–100. Plaintiff also points to produced text messages showing that Defendant Conover communicated with Promise Neighborhoods during the February 11th school board meeting, for which she was a moderator, to coordinate publicizing and sharing the petition. *Id.* at ¶ 122.

### 3. *Plaintiff is reinstated, refuses to return, and is then terminated*

ASD's investigation into Plaintiff lasted about seven months following the Garrity notice,[4] at which point it offered Mr. Moorehead a new position. Pl.'s Supp'l App. at SA0464; Pl.'s Resp. SUMF at ¶ 24. Defendants claim that the investigation was delayed because Plaintiff contested handing over his ASD-owned electronic devices, but Plaintiff denies that assertion. Pl.'s Resp. SUMF at ¶ 21. However, his reinstatement was contingent upon completion of a cultural competency training regarding black and Hispanic U.S. history. *Id.* at ¶ 24. Also, Plaintiff argues that ASD's offer was not a true reinstatement and claims that ASD planned to keep Plaintiff out of teaching roles. *Id.* at ¶ 24. ASD's reinstatement letter to Plaintiff, however, states that he is "returned to a teaching assignment," and that he "will be contacted by Human Resources with further information regarding [his] teaching

---

[4] A Garrity notice, or warning, is a written notice that local government employers give to employees before an administrative interview related to employee misconduct. The notice informs the employee that he is compelled to answer questions under threat of disciplinary action, including termination, and advises him that any truthful compelled statements cannot be used in a subsequent criminal prosecution.

location prior to the start date of the school year." Pl.'s Supp'l App. at SA0244–45. Plaintiff responded one month later, on August 16, 2021. He refused to return, citing safety concerns and stating—essentially—that ASD had constructively terminated him by falsely connecting him to the January 6 riot, which lead to significant community blowback. Pl.'s SUMF at ¶ 224.

Following Plaintiff's August 16, 2021 refusal, ASD initiated termination procedures against Plaintiff. On October 12, 2021, ASD issued a statement of charges alleging that Plaintiff exhibited a "willful neglect of duties" for failing to return to work. *Id.* at ¶ 28. ASD held a three-day *Loudermill* hearing[5] where it presented evidence of Plaintiff's refusal to return to work, and Plaintiff filed his objections. Pl.'s Resp. SUMF at ¶ 28. The hearing was run by a third-party hearing officer and, on July 28, 2022, the school board adopted the hearing officer's recommendation and terminated Mr. Moorehead. *Id.* at ¶ 31.

B.    Procedural Background

Plaintiff filed this civil rights lawsuit on August 23, 2022—about one month after he was terminated—in the Court of Common Pleas of Lehigh County. Defendants removed to this Court on October 5, 2022. Defendants filed a motion to dismiss one month later, and the Court granted that motion in part on April 17, 2023. Specifically, the Court dismissed Count III (requesting declaratory relief deeming Pennsylvania School Code Section 1122 as unconstitutional) as moot, Count IV (as it related to Plaintiff's stigma plus claim), and Count V (alleging various constitutional violations in connection with the FBI) in its entirety.[6] The Court also dismissed three defendants because Plaintiff

_____

[5] A government employer depriving an employee of a liberty or property interest must give the employee a meaningful opportunity to respond to the charges. This is known as a *Loudermill* hearing.

[6] Plaintiff's Amended Complaint (ECF No. 33) changed the roman numerals associated with each count alleged. The count numerals discussed in this section are from the original Complaint (ECF No. 1-1). In subsequent sections, when discussing the disposition of Defendants' motion for summary judgment, we use the Amended Complaint's count numerals.

failed to make individualized allegations against them and dismissed all official capacity suits as duplicative.

The parties engaged in extensive discovery that included disputes over privilege claims. Plaintiff filed a motion to compel on December 11, 2023. The Court ordered supplemental briefing and conducted *in camera* review of the contested documents. On April 8, 2024, the Court granted in part Plaintiff's motion to compel.

Defendant filed this motion for summary judgment on May 8, 2024, and a trial date is set for August 2, 2024.[7]

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

---

[7] Jury selection will begin the morning of August 2nd in Philadelphia and the trial will begin that afternoon, time-permitting. The remainder of trial will take place in Allentown.

quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

## IV.   DISCUSSION

### A.   First Amendment

Defendants limited their motion to the existence of a constitutional violation and forewent any individualized argument in the alternative that—even if we did not grant summary judgment to all defendants—some defendants were nonetheless entitled to relief. They limited their argument further by electing not to challenge the protected status of Plaintiff's speech. Because we find that issues of fact prevent us from granting summary judgment on Plaintiff's First Amendment claims, Counts I and II will proceed to trial against all fourteen individual Defendants.

Defendants do not earnestly address Plaintiff's theory of the case nor the most damaging evidence in support of that theory. In short, Plaintiff argues that Defendants defamed and constructively discharged him in retaliation for Plaintiff's attendance at former President Trump's political rally. Defendants skirt these issues by pointing solely to Plaintiff's refusal to return to work, without substantive discussion of the events between January 6, 2021 and Plaintiff's termination.

### 1.   *Retaliation for political expression*

"To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. The first factor is a question of law; the second factor is a question of fact." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (internal citations omitted). "A defendant may defeat the plaintiff's claim by demonstrating that the defendant would have taken the same adverse action in the absence of plaintiff's protected conduct." *Id.* at n.23

10

(*citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The first prong is satisfied; the activity in question was protected speech. "Public employees have a First Amendment right to speak freely on matters of public concern." *Curinga v. City of Clairton*, 357 F.3d 305, 309 (3d Cir. 2004) (citing cases). Nonetheless, this right is tempered by concerns for the efficient operation of public workplaces. *See Pickering v. Board of Educ.*, 391 U.S. 563, 567 (1968). A public employee's right to speak about matters of public concern must not be allowed to halt the operations of, say, a public school. On the other hand, the degree of disruption required will vary depending on the speech at issue. The "more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005) (*quoting Hyland v. Wonder*, 972 F.2d 1129–39 (9th Cir. 1992)).

Regardless of one's political leanings, it hardly needs stating that speech concerning one's preference for President is readily embraced by the First Amendment and is a matter of public concern. Mr. Moorehead travelled to Washington, D.C. and attended then-President Trump's political rally. He also issued four Facebook posts concerning the political rally he attended and the riot that he did not. These posts were made on his personal Facebook page, which was not public. His Facebook page did not affiliate him with ASD.

Balancing a public school teacher's First Amendment rights against his employing school's need for efficient operations is a challenging endeavor, but particularly so on this briefing. The Court anticipated significant argument over whether Plaintiff's activities were entitled to First Amendment protection, but it appears that after identifying the issue, Defendants passed on making any argument at all. The closest Defendant's brief came to arguing that any significant disruption occurred comes in footnote eight, but that footnote is conclusory. Defendants informed the Court that there was an "overwhelmingly negative response from the ASD Community," but provided no examples or otherwise supported that statement. Defs.' Br. at 15–19 and n.8.

Complicating matters further, we are provided those supporting details in Plaintiff's brief, which goes into great detail explaining the anger many community members felt. Plaintiff offers these details, however, in support of his defamation and constructive termination argument, which raises the most complicating issue of all in determining whether Plaintiff's activity was protected speech: how much of the "overwhelmingly negative response" was responsive to Plaintiff's actual conduct as opposed to Defendant's false portrayal of Plaintiff's conduct? On this point, the Court finds the school board meetings in January and February of 2021 instructive. These meetings occurred on January 28th, February 11th, and February 25th. The Court listened to the audio recordings of each meeting and noted with interest that the January 28th meeting was the calmest and most supportive of Plaintiff. The Court did not hear a single negative comment about Mr. Moorehead. The February meetings, particularly February 11th, were longer and dominated by impassioned residents speaking against Mr. Moorehead's continued employment.[8]

These changes coincided with Defendants Conover's engagement with Promise Neighborhood and its petition condemning "those who stormed[ed] . . . the capital in Washington." Pl.'s Supp'l App. at SA0526. At the time, Defendant Conover was a Promise Neighborhoods board member in addition to her position on the ASD school board. *Id.* at SA0535–36. Although the petition does not mention Plaintiff by name, it is plain from the record—including the comments left on the petition's web page—that the community connected Mr. Morehead with it. *Id.* at SA0526–29. It is only natural that signatories would make that connection when you consider that Defendants still had not corrected their Statement placing Plaintiff at the Capitol riot; or at least qualified the Statement to indicate that their investigation had not established that allegation. Promise Neighborhood's

---

[8] To be clear, we do not use terms "calm" and "impassioned" in any moralizing way. The *Pickering* balancing test calls on us to assess the disruption to school operations and that is all we intend to do with these descriptors.

promotion of the petition also closed this loop. One post promoting the petition began, "Jason Moorehead, the ASD teacher who participated in the riot at the Capitol, is seeking to be reinstated as a teacher at Raub Middle School." SA0538.[9]

Defendant Conover seems to have played an important role in creating this petition and encouraging signatories to speak at the February 11th school board meeting. Text messages show that Promise Neighborhood's Executive Director, Hassan Batts, thanked Defendant Conover for "nudging" him to create the petition and encouraging signatories to speak at the February 11th meeting. Pl.'s SUMF at ¶ 100. Other produced texts show Defendant Conover communicating with Promise Neighborhoods during the February 11th school board meeting, for which she was a moderator, to coordinate publicizing the petition and sharing it with ASD as well as to encourage more people to speak out against Plaintiff. *Id.* at ¶ 122.

The Court is mindful of the competing free speech issues in its analysis. This case concerns Mr. Moorehead's First Amendment rights, but it necessarily touches on the rights of others. Public school board meetings are excellent examples of some of our nation's most cherished principles like freedom of speech, direct democracy, government transparency, and public accountability. Nothing in our analysis should be taken as criticism of these principles or their encouraging embodiment at school board meetings. We are called to assess whether Plaintiff's activities disrupted his employer's

---

[9] Defendants repeatedly emphasize that the Statement did not identify Mr. Moorehead by name, but we think this fact matters little. *See* Restatement (Second) of Torts § 564 cmt. b ("It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended."). "Extrinsic facts," such as the community's knowledge and discussion of Plaintiff's Facebook posts, made it clear that the "statement refer[ed] to [Plaintiff] although the language used appear[ed] to defame nobody." *See id.*

Nor is it material that the extrinsic facts come from Plaintiff's own Facebook posts. Plaintiff did not state that he was at the Capitol riot in his posts. Though many could honestly make that assumption, the Statement placed ASD's imprimatur on that false inference, substantiating the falsehood in the minds of the community.

efficient operations such that his speech is entitled to no protection under the First Amendment. To do so, we must consider to what extent his employer and its governing members contributed to that disruption.

Absent any meaningful argument from Defendants to the contrary, and in consideration of the facts of this case, we hold that Plaintiff's activity was protected speech. Plaintiff attended a political rally and posted on his Facebook. He did not go to the Capitol Building, notwithstanding ASD's Statement and Promise Neighborhood's petition.

The second prong presents various issues of disputed fact best left for a jury. A reasonable juror could conclude based on Defendants' actions beginning on January 7, 2021, that Plaintiff's protected activity was a substantial factor in Plaintiff's initial suspension, the duration of Plaintiff's suspension and, ultimately, Plaintiff's termination. Some of Defendants' actions creating issues of fact include: (1) publishing the Statement that incorrectly placed Plaintiff at the Capitol riot, (2) Defendants' refusal to correct that Statement, and (3) coordinating with outside groups to encourage statements against Plaintiff based on that same false Statement.

### 2.      *Retaliation for political affiliation*

To succeed on a discrimination claim based on political affiliation, a public employee must make a prima facie showing that "(1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision." *Hill*, 455 F.3d at 243. Once the plaintiff establishes a prima facie case, the defendant may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir.2007) (*quoting Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)).

Prongs one and two are established. Plaintiff was a public school teacher—an apolitical position—and is a registered republican who publicly supported former President Trump's reelection in his personal life.[10]

Prong three is shared with the test for political expressional retaliation and is likewise an issue of fact for the jury.

    B.   <u>Procedural due process</u>

We grant Defendants summary judgment on Plaintiff's procedural due process claims because Mr. Moorehead cannot satisfy the legal requirements of these claims. It is well-known that § 1983 has no state exhaustion requirement—a feature that recognizes the role federal courts play in protecting completed federal constitutional violations. *Hochman v. Board of Education*, 534 F.2d 1094, 1096 (3d Cir. 1976) ("The Supreme Court has consistently noted that exhaustion of state remedies, whether judicial or administrative, is not required prior to the commencement of an action under 42 U.S.C. § 1983 in federal court.").

However, Plaintiffs may not cut state process short and then scream foul in federal court alleging a due process violation. "[I]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Reilly v. City of Atl. City*, 532 F.3d 216, 235 (3d Cir. 2008) (*citing Alvin v. Suzuki*, 227 F.3d 107, 110 (3d Cir. 2000)). This prerequisite does not create an exhaustion requirement. "[T]aking advantage of available processes is not a procedural hurdle, but is akin to an element of the claim because 'a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has

---

[10] The Third Circuit instructs that the "*Pickering* balancing should be used when termination is motivated by both a public employee's speech and political affiliation." *Curinga*, 357 F.3d at 312. Plaintiff's speech and affiliation claims fully overlap in this case and the Court need not repeat its analysis under *Pickering*.

not availed himself of those remedies.'" *Id.*

Following the school board's decision to terminate Plaintiff, and for a period of fifteen days, Mr. Moorehead was entitled to appeal that decision to the Secretary of Education for *de novo* review. *See* 24 Pa. Stat. Ann. § 11-1131. The Secretary's review would have included a hearing during which they could receive and consider testimony in addition to the record of the Board's decision. *See id.* This is just the type of administrative remedy that the Third Circuit has held to be a prerequisite to a § 1983 due process claim. *See e.g., Alvin v. Suzuki*, 227 F.3d 107, 116–18 (3d Cir. 2000) (holding that a tenured professor failed to state a § 1983 due process claim because he did not use the prescribed grievance procedure correctly).

Plaintiff has not identified any case law to the contrary. In fact, the case law he provides is either consistent with our reasoning above, *see e.g., McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995) ("[A] discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker.") or irrelevant, *see e.g., Stana v. Sch. Dist. of City of Pittsburgh*, 775 F.2d 122, 124 (3d Cir. 1985) (holding that the availability of post-deprivation redress does not absolve the lack of required pre-deprivation notice and an opportunity to be heard); *Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 258 (1st Cir. 1987) (Holding that the district court was correct when it refused to dismiss the case pursuant to *Younger* abstention).

By cutting the state process short, Plaintiff has cut off his due process claims at the knees.[11]

---

[11] Plaintiff brought five theories of due process violations under a single count. After a partially successful motion to dismiss, only three remained: pre-deprivation for suspension without pay, post-deprivation regarding the board hearing process, and a reputation plus claim. But each of these became foreclosed to Plaintiff when he did not appeal to the Secretary of Education.

In any case, even absent *Reilly*, Plaintiff states that he "is not continuing with" his pre-deprivation claim for suspension without pay. Pl.'s Resp. at 50 n.24.

Mr. Moorehead may not complain of constitutionally inadequate state process to a federal court after leaving administrative remedies on the table. Count III is dismissed accordingly. [12]

     C.    <u>Qualified Immunity</u>

     Defendants affirmatively raise a qualified immunity defense, but they do so in name only. For the reasons that follow, the Court summarily denies Defendants' purported claim of qualified immunity.[13]

     "It is the defendant official's burden to establish that he is entitled to qualified immunity." *Muth v. Woodring*, 666 F. App'x 137, 139 (3d Cir. 2016). "When evaluating a claim of qualified immunity, courts engage in a two-pronged inquiry. The first prong probes whether the allegations . . . 'show the officer's conduct violated a [federal] right[.]'" *Id.* The second prong considers "whether the law was clearly established at the time of the violation." *Id.* (*quoting Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d. Cir. 2010)). The focus is on whether "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was

---

[12] There is no need to reconcile our ruling on Defendants' motion to dismiss—affirming that there is no exhaustion requirement under § 1983 and refusing to dismiss Plaintiff's due process claims on those grounds—with our present ruling because they address different arguments. We are not dismissing Plaintiff's due process claims because he failed to exhaust. We are dismissing them because "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Reilly*, 532 F.3d at 235 (*citing Alvin*, 227 F.3d at 116). Our rulings in this case are consistent, as evidenced by the fact that Plaintiff's likewise unexhausted First Amendment claims will survive summary judgment.

[13] Defendants also reraise their claim of immunity under Pennsylvania's "high public official" immunity for defamatory actions. For the second and final time, the Court denies their request. "Individual Defendants' assertion of High Public Official Immunity is inapplicable to Plaintiff's claims because High Public Official Immunity applies only to Pennsylvania state law claims," and there are no state law claims in this action. *Moorehead v. Sch. Dist. of Allentown*, No. 5:22-CV-03959-JMG, 2023 WL 2976556, at *10 (E.D. Pa. Apr. 17, 2023) (*citing Kohn v. Sch. Dist. of Harrisburg*, No. 1:11-cv-109, 2012 WL 1598096 at *8 (M.D. Pa. May 7, 2012) ("the state-law doctrine of high public official immunity shields officials only from state-law claims, not federal ones.")).

violating it." *Dean v. Borough of Glassboro*, No. 21-2468, 2023 WL 2597586, at *2 (3d Cir. Mar. 22, 2023).

However, since *Pearson v. Callahan*, district courts are not required to resolve whether a constitutional violation occurred in-fact before deciding whether that right was clearly established. *See* 555 U.S. 223, 236 (2009). "*Pearson* explained that courts can assume a constitutional violation and immediately consider whether the challenged actions were prohibited by clearly established law if that would end the case." *Dean*, 2023 WL 2597586, at *2 (*citing id.* at 236–37).

The preceding provides the correct framework for raising a qualified immunity defense, but Defendants chose to chart their own path. They argue that the individual defendants are entitled to qualified immunity because none of them acted with "deliberate indifference." This argument misstates the standard. The absence of subjective intent is neither necessary nor sufficient to a qualified immunity defense. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense.").

By arguing the wrong standard, Defendants have not presented the Court with the relevant facts or case law to determine whether any individual defendant is entitled to qualified immunity. The burden to establish qualified immunity rested with Defendants and they did not meet it.

D.     Municipal Liability

To establish municipal liability, plaintiffs must do more than "identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). They must also "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This is the heightened burden that distinguishes municipal liability from *respondeat superior*, and

there are several well-worn paths for plaintiffs to meet this burden. *See e.g., Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694–95 (1978) (execution of a government's formal policies); *id.* (execution of de facto policies and customs); *City of Canton v. Harris*, 489 U.S. 378, 380 (1989) (failure to train municipal employees). We agree with Defendants that "[t]his matter should be analyzed as a 'single incident'" event. *See* Defs.' Br. 65 at 8.

"[A] municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (plurality opinion). The Supreme Court has provided the following guiding principles when deciding whether municipal liability attaches according to a single decision by a final policymaker: (1) municipalities may only be liable for acts that they have officially sanctioned, (2) only officials speaking with final policymaking authority, as granted by the state, may subject the government to liability (3) whether a particular official has final policymaking authority is a question of state law, and (4) "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy *in that area* of the city's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (*citing Pembaur*, 475 U.S. at 480–83 and n.12 (1986)). In addition to these guidelines, a plaintiff must establish that the person or entity acted with deliberate indifference to the right at issue. *See San Filippo v. Bongiovanni*, 30 F.3d 424, 445 (3d Cir. 1994), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

Defendants' challenge to municipal liability is narrow in terms of law and fact. As to their legal challenges, they argue that Mr. Moorehead has not identified a custom or policy that deprived him of any rights. And, even if Plaintiff had done so, they are nonetheless entitled to summary judgment because they did not act with deliberate indifference. Both arguments fall short. First, under the "single decision" theory of municipal liability, the decision and the policy are one and the same.

*See San Filippo*, 30 F.3d at 445 ("A single decision by a final policy-maker, as defined by state law, may constitute official policy.") (*citing Pembaur*, 475 U.S. at 480–81). Plaintiff has identified several decisions that—if executed with deliberate indifference and in violation of Mr. Moorehead's federal rights—may constitute official policy.

Defendants' second legal argument regarding deliberate indifference fares no better, and because it intertwines with some of their factual challenges, we will address them together. The motion for summary judgment argues that no reasonable juror could conclude that the Statement or Defendants' decision to terminate Mr. Moorehead were done with deliberate indifference. We disagree.

The Statement—signed by Defendant superintendent Parker—falsely reported to the community that a teacher "was involved in the electoral college protest that took place at the United States Capitol Building on January 6, 2021." Neither Defendant Parker nor any other ASD administrator had asked Mr. Moorehead whether he had attended the riot at the Capitol Building before issuing this Statement and publishing it to the district's website and Facebook account, Plaintiff's middle school's Facebook account, and other social media as well as emailing it to all district employees. On January 26, 2021, Plaintiff requested Defendants issue a correction because he was being harassed and receiving death threats. Pl.'s SUMF ¶ 89. Also, his home address had been publicized and he was receiving voicemails threatening his family. *Id.* at ¶ 86. Several of these voicemails accused him of lying about his presence at the Capitol riot. *Id.* To this day, Defendants have done nothing to correct their error. These actions leave little doubt that a reasonable juror could conclude that Defendant Parker acted with deliberate indifference and municipal liability attaches accordingly.

We reach the same conclusion regarding the school board's decision to terminate Plaintiff. Once again, Defendants do not grapple with Plaintiff's theory of retaliatory constructive termination.

20

They instead point to Mr. Moorehead's admitted refusal to return to work, suggest we look no further, and hold that no reasonable juror could conclude that the termination was pretextual—but a reasonable juror could conclude otherwise. A reasonable juror could view the events preceding Mr. Moorehead's refusal to return to work and conclude that Defendants' alleged retaliation made such a return under then-present conditions impossible. And in that case, the school board's decision to terminate could constitute a single decision by a final policymaker sufficient for municipal liability to attach.

Finally, Defendants argue the public school board meetings in January and February of 2021 transpired without impropriety and may not serve to attach municipal liability. The record indicates otherwise as discussed above. The actions of several school board members could reasonably be interpreted by a jury as retaliatory action in violation of Mr. Moorehead's First Amendment rights, and a jury could find that municipal liability therefore attaches. *See LaVerdure v. County of Montgomery*, 324 F.3d 123, 126 (3d Cir. 2003) (acknowledging "School Board members" are "entrusted with a policymaking role for the School District.") (*quoting Zugarek v. S. Tioga Sch. Dist.*, 214 F. Supp. 2d 468, 479 (M.D. Pa. 2002)).[14] The record suggests that the February meetings may not have been such innocent examples of direct democracy as Defendants portray them.

### E.   Claims for relief are not independent causes of action

We dismiss Count V without striking them because declaratory and injunctive relief are not independent causes of action. *See Kabbaj v. Google Inc.*, 592 F. App'x 74, n.2 (3d Cir. 2015).

## V.   CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment in part. Summary judgment is granted regarding Plaintiff's due process claims, but is otherwise denied. All

---

[14] As we mentioned above, Defendants have argued against *Monell* liability on narrow grounds. They have not, for example, argued that individual board members are not final policymakers capable of satisfying the *Monell* framework.

remaining Defendants will proceed to trial where Plaintiff's First Amendment retaliation claims will

be decided by a jury.

A separate order follows.


BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Judge